## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| DOYLE LEE HAMM, | ) | Civil Action No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **EXECUTION SCHEDULED** |
| | ) | |
| JEFFERSON S. DUNN, Commissioner, | ) | **Thursday, February 22, 2018** |
| Alabama Department of Corrections; | ) | |
| | ) | |
| CYNTHIA STEWART, Warden, | ) | |
| Holman Correctional Facility; | ) | |
| | ) | |
| STEVE MARSHALL, Alabama | ) | |
| Attorney General; and | ) | |
| | ) | |
| OTHER UNKNOWN EMPLOYEES | ) | |
| AND AGENTS, | ) | |
| Alabama Department of Corrections; | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT

Doyle Lee Hamm has been on Alabama's death row for thirty years and is now battling lymphatic cancer. A few years ago, in 2014, Mr. Hamm was diagnosed with a large cell lymphoma behind his left eye and in his cranium—specifically in the left orbit and skull base. Mr. Hamm was treated with massive radiation therapy to his cranium and other medication treatments. As a result of his cancer, cancer treatments, and extensive prior medical history, Mr. Hamm's veins are severely compromised. Despite his lymphatic cancer and impaired veins, the Alabama Attorney General is moving forward with execution by lethal injection and the Alabama Supreme Court has set an execution date for February 22, 2018.

1

If Defendants proceed with their plan to lethally inject Mr. Hamm, he will suffer an agonizing, bloody, and painful death. Mr. Hamm's serious and deteriorating medical condition poses an unacceptable risk that he will experience significant pain constituting cruel and unusual punishment in violation of the Eighth Amendment. Mr. Hamm is not here alleging that Alabama's lethal injection protocol is facially unconstitutional. He asserts only that the lethal injection protocol, as applied to him, will violate his rights because of his unique and serious medical conditions. Mr. Hamm seeks both emergency and permanent relief requesting that this Court declare and enforce his rights under 42 U.S.C. § 1983 and the Eighth Amendment to the United States Constitution by ordering Defendants not to carry out their plan to lethally inject him.

Due to his lengthy medical history, cancer, and cancer treatment, Mr. Hamm's veins are severely compromised, making traditional peripheral intravenous access extremely difficult, if not impossible. In the nearly certain scenario that the Alabama Department of Corrections ("ADOC") is unable to access Mr. Hamm's peripheral veins, prison personnel will likely attempt to access a central vein. Accessing a central vein involves a complicated and dangerous procedure made much riskier by Mr. Hamm's serious lymphatic cancer. Finding a central vein is difficult even for capable medical professionals and establishing access risks a bloody and excruciating experience for Mr. Hamm. The procedure requires a level of training, experience, and supervision that prison personnel are highly unlikely to possess. Moreover, every central vein is located near the human body's largest clusters of lymph nodes and Mr. Hamm's lymphatic cancer has caused his lymph nodes to unpredictably swell, making central venous access substantially riskier and more difficult in this case.  If the ADOC attempts to establish venous access for the purposes of lethal

injection, there is a "substantial risk of serious harm" that is "objectively intolerable," in violation of the Eighth Amendment. *Baze v. Rees*, 553 U.S. 35, 50 (2008).

In addition to establishing that Alabama's protocol for venous access for lethal injection poses an unconstitutional risk of harm to him, Mr. Hamm also offers an alternative method of lethal injection that is "feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *Baze*, 553 U.S. at 50. Mr. Hamm proposes that, instead of the intravenous method of lethal injection, the ADOC execute him by an oral injection of a lethal drug cocktail, including alone or in combination, morphine, valium, pentobarbital, secobarbital, phenobarbital, chloralhydrate, lorazepam, and/or midazolam. This method would be presently permitted by Alabama statute, as required by law. *See Arthur v. Comm'r, Alabama Dep't of Corr.*, 840 F.3d 1268 (11th Cir. 2016); *Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853 (11th Cir., 2017). [1] Alabama law currently authorizes two methods of execution: lethal injection and electrocution. *See* Ala. Code § 15-18-82.1(a). Mr. Hamm has waived the electrocution

---

[1] The holding in *Arthur* has faced a significant number of challenges in the short time since it was decided. Earlier this year, Justice Sotomayor, joined by Justice Breyer, dissented from the Court's denial of writ of certiorari in the *Arthur* case. *Arthur v. Dunn, Comm'r , Alabama Dep't of Corr.*, 137 S.Ct. 725 (2017). Justice Sotomayor expressed grave concern that, under the Eleventh Circuit's "alarming misreading" of Supreme Court precedent, "even if a prisoner can prove that the State plans to kill him in an intolerably cruel manner, and even if he can prove that there is a feasible alternative, all a State has to do to execute him through an unconstitutional method is to pass a statute declining to authorize any alternative method." *Id*. at 729. In two cases brought before the Eleventh Circuit this year, Judge Wilson, who also dissented in *Arthur*, has continued to argue that *Arthur* was wrongly decided – an argument that has gained traction with other Eleventh Circuit judges. *Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 877 (11th Cir. 2017) (Wilson, J., concurring); *Ledford v. Comm'r, Georgia Dep't of Corr.*, 756 F.3d 1327 (11th Cir. 2017) (Wilson, J., dissenting) (joined by Judges Martin, Rosenbaum, and Pryor (who also authored a separate dissent)). Other courts have also expressed their concern with the *Arthur* holding. *McGehee v. Hutchinson*, No. 17-00179, 2017 WL 1399554 at *39 (E.D. Ark., Apr. 15, 2017), *vacated on other grounds by McGehee v. Hutchinson* (*McGehee II*), 854 F.3d 488 (8th Cir. 2017) (en banc) (finding that the "Eleventh Circuit's limitation of alternative methods to those presently permitted under state law finds no textual basis in *Baze* and *Glossip*"); *In re Ohio Execution Protocol*, 860 F.3d 881, 910 (6th Cir. 2017) (Stranch, J., concurring in the dissent) (citing Justice Sotomayor's dissent in *Arthur v. Dunn*).

option, as he did not make the choice in writing within 30 days of the certificate of judgment,

pursuant to § 15-18-82.1(b), so he is foreclosed from offering any alternative but lethal injection.

However, an oral injection of a lethal drug constitutes an "injection," so such a method is

allowed under current Alabama law. An oral injection of a lethal drug cocktail, including alone

or in combination, morphine, valium, pentobarbital, secobarbital, phenobarbital, chloralhydrate,

lorazepam, and/or midazolam, is a readily implemented alternative that will eliminate the

significant likelihood of pain and suffering associated with an intravenous injection in Mr.

Hamm's case.


## JURISDICTION

1.    Federal question jurisdiction over this matter arises under 42 U.S.C. § 1983, 28 U.S.C. §

1331, 28 U.S.C. § 1343, 28 U.S.C. § 2201, and 28 U.S.C. § 2202.


## VENUE

2.    Venue is appropriate in the Northern District of Alabama under 28 U.S.C. § 1391(b) as

plaintiff Doyle Hamm is currently located in Donaldson Correctional Facility in Bessemer, Alabama.


## THE PARTIES

3.    Plaintiff Doyle Lee Hamm is a United States citizen and resident of the State of Alabama.

He is a death-sentenced prisoner currently being held in the custody of Defendants at the Donaldson

Correctional Facility in Bessemer, Alabama.

4.    Defendant Jefferson S. Dunn is the Commissioner of the Alabama Department of

Corrections, which is headquartered in Montgomery, Alabama. Mr. Dunn is responsible for

overseeing operations at the Alabama Department of Corrections and has an obligation to ensure that all executions are carried out in compliance with the United States Constitution.

5.     Defendant Cynthia Stewart is the Warden of Holman County Correctional Facility in Atmore, Alabama, where Alabama conducts its executions by lethal injection. Alabama statute requires the Warden of Holman Correctional Facility, or a designated employee, to administer the lethal injection. Ala. Code § 15-18-82. The Warden, or the designated employee, has a duty to carry out the lethal injection in compliance with the United States Constitution.

6.     Defendant Steve Marshall is the Alabama Attorney General, whose offices are headquartered in Montgomery, Alabama. Mr. Marshall is the representative of the State of Alabama for purposes of this death penalty case and has a duty to ensure that the lethal injection in this case is carried out in compliance with the United States Constitution.

7.     Other Unknown Employees and Agents of the Alabama Department of Corrections are involved in the implementation of the Department's execution procedures. Mr. Hamm does not yet know the identity of these persons.

8.     All Defendants are being sued in their official capacities. The named Defendants are United States citizens and residents of Alabama.

**PROCEDURAL HISTORY**

9.     Mr. Hamm was convicted and sentenced to death by the Circuit Court of Cullman County in 1987.  On direct appeal, the Alabama Court of Criminal Appeals and the Supreme Court of Alabama affirmed Mr. Hamm's conviction and death sentence. *Hamm v. State* , 564 So. 2d 453 (Ala. Crim. App. 1989), *aff'd* 564 So. 2d 469 (Ala. 1990). The United States Supreme Court then

denied Mr. Hamm's petition for writ of certiorari to the Alabama Supreme Court in 1990. *Hamm v. Alabama*, 498 U.S. 1008 (1990).

10.  On December 3, 1991, Mr. Hamm filed a Rule 32 state post-conviction petition. In 1999, the trial court held an evidentiary hearing and subsequently denied the petition. Despite serious constitutional questions about the court's order denying the petition, the Alabama Court of Criminal Appeals affirmed the denial. *Hamm v. State*, 913 So. 2d 460 (Ala. Crim. App. 2002). Both the Alabama Supreme Court and the United States Supreme Court denied Mr. Hamm's petition for writ of certiorari.

11.  Mr. Hamm then filed for federal habeas corpus in May 2006. The district court denied the petition on March 27, 2013. *Hamm v. Allen*, 2013 WL 1282129 (N.D. Ala., 2013).  The Eleventh Circuit affirmed the denial of the habeas petition. *Hamm v. Comm'r*, 620 F. App'x 752 (11th Cir. 2015). The United States Supreme Court then denied Hamm's petition for writ of certiorari. *Hamm v. Allen*, 137 S. Ct. 39 (2016).

12.  On December 13, 2017, the Supreme Court of Alabama entered an order authorizing Mr. Hamm's execution on February 22, 2018. Defendants have scheduled his execution for February 22, 2018.

## FACTUAL BACKGROUND

13.  Doyle Hamm has a long and complicated medical history. Most recently, Mr. Hamm has been diagnosed with a severe and worsening cranial and lymphatic cancer. Mr. Hamm also has Hepatitis C, a history of seizures and epilepsy, multiple significant head injuries, and severely compromised veins due to years of intravenous drug use.

**Mr. Hamm's Cancer**

14.   Mr. Hamm is suffering from a serious cranial and lymphatic cancer.

15.   Mr. Hamm's cancer was originally identified in February 2014, when a pathology report diagnosed "a poorly marginated mass within the left orbit [of the skull] with both intraconal and extraconal components. This appears to extend through the orbital apex via the superior and inferior orbital fissures both of which appear enlarged. The left foramen rotundum is asymmetrically enlarged. The cortex along the lateral aspect of the left vidian canal appears mildly slightly eroded. The lesion probably extends into the left cavernous sinus. There is mild left proptosis." *See* Doyle Hamm Donaldson Medical Records, p. 189. In other words, the doctors found that Doyle Hamm had a large tumor in the back of the left eye socket, where the nerves from the brain go to the eye; and that this tumor protruded through the holes (superior and inferior orbital fissures) on both the brain and eye side. The doctors reported their preliminary impression: "Left orbital neoplasm with possible perineural tumor spread to the left cavernous sinus and left masticator space [of the skull]." *See* Doyle Hamm Donaldson Medical Records, p. 189-190. The pathology reports indicated that these findings were consistent with a "B-cell lymphoma," a type of blood cancer in the lymph nodes. *See* Doyle Hamm Donaldson Medical Records, p. 165. Another report at the time determined that "The epidermis is ulcerated. Budding from the dermal epidermal junction [where the outer (epidermal) and inner (dermal) sections of the skin meet] are geometrically shaped tumor islands consisting of basaloid cells [this suggests it is a lymphoma]. The tumor islands are mitotically active and demonstrate peripheral palisading. There is peritumoral reactive fibroplasia and cellularity." *See* Doyle Hamm Donaldson Medical Records, p. 174.

16.   In April 2014, a CT scan confirmed that the "Left orbit [of the skull] is abnormal, large soft tissue masses seen in the left orbit resulting in expansion of the bony orbit. Proptosis seen. This

mass is surrounding the left optic nerve complex. Posteriorly, the mass extends up to the orbital

apex. There is also extension through the inferior orbital fissure into the pterygopalatine fossa,

masticator space and the buccal space. There is also suggestion of extension to the left vidian canal"

*See* Doyle Hamm Donaldson Medical Records, p. 151. In other words, the cancer extended into the

eye through the holes where the nerves go through, and down into the spaces near the cheek bone,

the masticator space and the buccal space. This led to a preliminary diagnosis by Dr. Brian Adler of

the Brookwood Cancer Center in Birmingham, Alabama, of a "MALT lymphoma or marginal zone

lymphoma," and the recommendation for immediate radiation therapy and the possibility of "a

Rituxan based regimen that will probably include some cytotoxic chemotherapy." *See* Doyle Hamm

Donaldson Medical Records, p. 135. The doctors also found at that time, on examination of Mr.

Hamm's abdomen, numerous "granulomata throughout the spleen" and abnormal lymph nodes in the

abdomen. *See* Doyle Hamm Donaldson Medical Records, p. 140.

17.   In May 2014, the doctors at Brookwood Cancer Center confirmed a primary diagnosis of

"Large cell lymphoma unspecified site, Diagnosed 2014 (Active)" and indicated that it   was

aggressive and fast growing. *See* Brookwood Hamm Report from 2014, p. 10. The doctors reported

that the "scans demonstrated a large mass in the retro-orbital area on the left extending into the

masseter space [cavity in face above jaw, under temple]. There was a suggestion of widening of the

neural foramen [space in spine through which the spinal cord runs]. In the chest were noted

numerous abnormal lymph nodes [and] a few small nodes were seen in the abdomen." *See*

Brookwood Hamm Report from 2014, p. 10.

18.   In June 2014, the doctors confirmed "the presence of a tumor extending through the

foramina into the pterygoid space and into the middle cranial fossa. There is involvement of the

cavernous sinus as well as extension into the left side of the nasopharynx." *See* Doyle Hamm

Donaldson Medical Records, p. 111. Note that the "nasopharynx" is the back of the throat and the "foramina" is plural of foramen, which means a cavity in the bone; the spinal cord goes through a foramen in this area, so the cancer was right next to the spinal cord. The fact that the cancer was nearing the middle cranial fossa suggests that it was entering the cranial cavity. The pterygoid space is the space where the head and spine meet. The middle cranial fossa is the space in the skull above where the spine meets the head. The doctors reported that "The patient appears chronically ill." *See* Doyle Hamm Donaldson Medical Records, p. 111. The doctors also indicated that "There is some risk of involvement of the spinal fluid." *Ibid.* The treating physician at Brookwood said he would "request approval from the prison medical clinic for the patient to have a lumbar puncture with cytology. In the interval I recommended that we proceed with radiation therapy as he is going to require some form of local treatment even if he takes systemic chemotherapy." *Ibid.*

19.   The different diagnoses all concur that the cancer spread from inside the left eye socket (the "left orbit"), through the holes where the optic nerves travel and back into the cavities under the cheek bone and towards the spot where the spinal cord meets the skull.

20.   In July 2014, Mr. Hamm underwent radiation therapy, specifically "IMRT to 40Gy over 20 fractions for orbital lymphoma completed on July 11, 2014." *See* Brookwood Hamm Report from 2014, p. 6.

21.   By September 2014, the doctors at Brookwood felt that there had been some improvement. They reported that Mr. Hamm had "completed 40 gray for a lymphoma involving the left orbit and skull base. He is feeling better at this time. Constitutional: Complains of poor appetite and major fatigue. Eyes: Complains of double vision with the left eye and visual difficulties of the left eye that is also dry and red. Complains of some pain in the left eye but has gotten better." *See* Brookwood Hamm Report from 2014, p. 3.

22.   One year later, in September 2015, Mr. Hamm showed some improvement, even though there was evidence from the tests of "Abnormal enhancement […] in the left orbit with involvement in the left pterygopalatine fossa and left infratemporal fossa/masticator space region. Abnormal enhancement is also seen in the inferior orbital fissure and in foramen ovale, and along foramen rotundum on the left." *See* Doyle Hamm Donaldson Medical Records, p. 629. But these "areas of abnormal enhancement are improved in appearance when compared with 3/10/2015 and markedly improved from 9/29/2014." *Ibid.*

23.   However, beginning in March 2017, the cancer has come back and Mr. Hamm has been experiencing lymphadenopathy associated with his earlier diagnosed and treated skull-orbital cancer. In March or April 2017, Mr. Hamm was seen by a doctor in Jasper, Alabama, who conducted a biopsy and found that it was cancerous. The doctor ordered surgery, but Mr. Hamm has not yet been allowed to return for surgery. Mr. Hamm apparently also now has a lesion on his face that is the size of a quarter. *See* Preliminary Report of Mark. J. S. Heath, M.D., ¶ 10 (attached as Appendix A). On March 7, 2017, Mr. Hamm was complaining of "'knots' on my chest" and the medical team was reporting that "These feel like lymph nodes." *See* Doyle Hamm Donaldson Medical Records, p. 453. On March 2017, Mr. Hamm reported that he "Need[s] to see the doctor I have lumps in my chest." *See* Doyle Hamm Donaldson Medical Records, p. 472; see also *ibid.,* p. 470 ("lumps in chest").

24.   A recent visual examination of Mr. Hamm revealed two abnormal lumps on Mr. Hamm, one under his chin on the left side and one on the back right of his neck below his right ear. *See* Report by Nicola Cohen in Update No. 1 filed with this Court on September 1, 2017. Mr. Hamm currently is experiencing lymphadenopathy in his neck, chest and abdomen, which is likely associated with worsening lymphoma cancer. He is in pain and is taking a massive amount of prescribed pain relievers. Mr. Hamm is not malingering his condition.

**Mr. Hamm's Severely Compromised Veins**

25.   As a result of a long and complicated medical history made worse by cranial and lymphatic cancer and serious cancer treatments, Doyle Hamm's veins are most likely inaccessible for the purposes of lethal injection. It will be extremely difficult to achieve venous access and remotely administer the anesthetic drugs at Holman Prison. Moreover, because of his lymphatic cancer, which causes inflamed abnormal lymph nodes around arteries and veins, it will be anatomically difficult and extremely dangerous to attempt accessing Mr. Hamm's central veins.  As a result, there is a substantial likelihood that the Alabama Department of Corrections will not be able to accomplish a successful execution in compliance with the Eighth Amendment.

26.   Dr. Mark Heath is a leading anesthesiologist in this country. He has almost 30 years of experience, and practices at one of the leading hospitals in the country, performing on a daily basis anesthesia for open-heart surgeries. Dr. Heath practices at the New York-Presbyterian/Columbia Hospital in New York City, where his duties include, on a daily basis, "obtaining both peripheral and central intravenous (IV) access, the administration of large doses of anesthetic agents, and intensive monitoring to ensure that [his] patients are both safe and fully anesthetized." *See* Preliminary Report of Mark. J. S. Heath, M.D., ¶1. Dr. Heath has practiced anesthesiology for 29 years and is a professor of clinical anesthesiology at Columbia University in New York City. *See ibid.,* ¶1.

27.   Dr. Heath also has experience with lethal injection procedures. Because of his expertise as an anesthesiologist, Dr. Heath has been "called upon to give expert medical opinion in a number of cases involving the use of lethal injection at both the federal and state level, including with the Federal Bureau of Prisons and in the correctional systems of California, Florida, Ohio, and Texas, among others." *Ibid.,* ¶2. Specifically, Dr. Heath was an expert in the Federal District Court litigation surrounding the lethal injection of inmate David Nelson in the State of Alabama, and was

present when Mr. Nelson was examined by a cardiac anesthesiologist at Holman Prison in 2006.

28.   On Saturday, September 23, 2017, Dr. Heath conducted an extensive medical examination, including a lengthy medical history interview and a substantial physical exam of Mr. Hamm. Dr. Heath concluded, based on his extensive experience obtaining venous access at one of the top-ranked hospitals in the country, that (1) Mr. Hamm's peripheral veins are damaged and will be extremely difficult to access for lethal injection; and (2) access to his central veins through his groin or neck is equally problematic because of Mr. Hamm's cancerous lymphadenopathy.

29.   Dr. Heath found no usable veins on Mr. Hamm's left arm and hand, left leg and foot, right leg and foot, and right arm. Dr. Heath found one "small, tortuous vein" on his right hand "that is potentially accessible with a butterfly needle"; however, lethal injection requires a larger intravenous catheter, much larger than a butterfly needle. Dr. Heath concluded: "Based on my knowledge of previous Alabama lethal injection procedures and protocols, this small, tortuous vein on his right hand would not provide reliable peripheral venous access." *Ibid.,* ¶7. In lay terms, Dr. Heath found no usable veins for lethal injection.

30.   The one small vein on Mr. Hamm's right hand that Dr. Heath assessed as being "potentially accessible" is the vein that ADOC has used to draw blood from Mr. Hamm in the past. However, Mr. Hamm informed undersigned counsel that as of November 29, 2017, ADOC has been unable to access this particular vein and has been unable to draw blood from any of his veins.

31.   Dr. Heath also found that Mr. Hamm's lymphatic cancer would likely interfere with any attempt to access his central veins. As Dr. Heath explained, Mr. Hamm has "intermittent waxing and waning tumors on his chest, neck, and groins. This likely represents lymphadenopathy (swollen lymph nodes) related to his lymphatic malignancy." *Ibid.,* ¶8. This condition would likely interfere with accessing his central veins. Dr. Heath noted that "Lymphoma, like other cancers, is a

progressive disease if not cured. At this point, there may be significant involvement and enlargement of lymph nodes in other areas of his body, including his neck, chest, and groin. If there are enlarged lymph nodes surrounding the veins in his neck, chest, or groin, it would likely complicate or thwart attempts to obtain central venous access." *Ibid.,* ¶14. As noted earlier in paragraphs 23 and 24, Mr. Hamm's medical records from Donaldson report a nurse or doctor finding knots that "feel like lymph nodes" and a visual inspection also observed lumps on Mr. Hamm's chin and neck. In addition, Dr. Heath reported, from his prior experiences in Alabama, that "To the best of my knowledge, Alabama has limited experience with obtaining central vein access for lethal injection procedures." *Ibid.,* ¶13. In lay terms, central venous access for Mr. Hamm is likely extremely difficult because of the combination of Mr. Hamm's lymphatic cancer and the lack of a fully equipped hospital operation-room set up at Holman Prison.

32.   Dr. Heath gave his expert opinion in conclusion: "I have not seen the exact protocol for venous access for lethal injection from the state of Alabama, but based on what I know from the David Nelson case, it is my opinion that the state is   not equipped to achieve venous access in Mr. Hamm's case." *Ibid.,* ¶16.

33.   Mr. Hamm's case is additionally complicated by the fact that he has Hepatitis C, which is easily transmitted by blood. A messy and potentially bloody attempt at peripheral or central venous access puts the ADOC staff at great risk of contracting Hepatitis C.

34.   In sum, venous access for Mr. Hamm, both peripheral and central, appears extremely difficult, and the attempt would likely be arduous, excessively painful, and in violation of the Eighth Amendment. Mr. Hamm does not have accessible peripheral veins and his lymphadenopathy means that his abnormal lymph nodes will likely present obstacles to access and severe complications. All of this would present a serious medical challenge even in a fully functional hospital operating room

13

with a senior anesthesiologist and a team of different specialists and full medical equipment. At

Holman Prison, the attempt would likely result in cruel and needless pain in violation of the Eighth

Amendment. *Estelle v. Gamble,* 492 U.S. 97 (1976); *Baze v. Rees,* 553 U.S. 35 (2008); *Glossip v.

Gross,* 135 S. Ct. 2726 (2015).

### Alabama's Execution Protocol

35.   The Alabama Code prescribes that "[a] death sentence shall be executed by lethal

injection, unless the person sentenced to death affirmatively elects to be executed by electrocution."

Ala. Code § 15-18-82.1(a). The choice to be executed by electrocution must be made "within 30

days after the certificate of judgment pursuant to a decision by the Alabama Supreme Court

affirming the sentence of death." Ala. Code § 15-18-82.1(b).  If the election for death by

electrocution is not made within 30 days, the option is waived. *Id.* The statute contains no definition

or required method of "lethal injection."

36.   Alabama's current lethal injection protocol is not publicly available, and the Attorney

General has refused to disclose, even confidentially, the venous protocol to Mr. Hamm's counsel. As

a result, the venous protocol is simply unknown. Alabama has used consistently since September

2014, and most recently, the intravenous administration of: (1) 500 milligrams of midazolam

hydrochloride, (2) 100 milligrams of rocuronium bromide, and (3) 240 milliequivalents of potassium

chloride. *See, e.g., Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1274 (11th Cir. 2016).

37.   Due to the secrecy surrounding Alabama's lethal injection protocol, it is not clear how

the Department of Corrections handles executions in which the prisoner's veins are severely

compromised and conventional peripheral access is not possible. Despite repeated attempts,

undersigned counsel has not been provided any information from the Attorney General about the

Alabama protocol for venous access. Counsel renewed his request for the protocol for venous access by letter dated Monday, September 11, 2017, but has received no response.

38.   Based on factual situations in similar recent cases, as well as conversations with Dr. Heath, undersigned counsel understands that the only realistic option that ADOC will consider as an alternative to peripheral access is percutaneous central venous access.

39.   In the past, ADOC has proposed another technique: a "cut-down" procedure to access peripheral veins. This procedure is a surgical venous technique that requires a doctor to make an incision in a patient's arms or legs to expose a peripheral vein into which a cannula is inserted. The procedure has been described as a "dangerous and antiquated medical procedure to be performed only be a trained physician in a clinical environment with the patient under deep sedation. In light of safer and less-invasive contemporary means of venous access…'there is no comprehensible reason for the State of Alabama to be planning to employ the cut-down procedure.'" *Nelson v. Campbell*, 541 U.S. 637, 642 (2004). In *Nelson,* the State itself recognized how risky and complicated the cut-down procedure was, ultimately deciding against the technique and instead proposing central venous access. Due to the recognized dangers of the cut-down technique, it is therefore highly unlikely that ADOC will attempt such a procedure.

40.   The most likely, and only potentially feasible, alternative for venous access in this case is percutaneous central venous access, as the Georgia Department of Corrections has done. Central venous cannulation is "a technique for gaining access to one of the major veins in an individual's body." *Gissendaner v. Comm'r, Georgia Dept' of Corr.* (*Gissendaner I*), 779 F.3d 1275, 1278 n.4 (11th Cir. 2015). This technique is most commonly attempted on one of three central veins: the internal jugular vein in the neck, the femoral vein in the groin, or the subclavian vein near the clavicle. Each of these veins is located near the largest groupings of lymph nodes in the human body.

41.   In Mr. Hamm's case, percutaneous central venous access is likely to be extremely dangerous. Finding a central vein is difficult and typically requires ultrasound equipment to reliably locate the correct vein. If done incorrectly or imprecisely, the technique risks puncturing arteries, which could lead to a bloody and painful death before the drugs are even administered. The procedure requires a level of medical training and experience that ADOC is, in all likelihood, unable to provide.

42.   Percutaneous central venous access is also highly dangerous for Mr. Hamm in particular because of his serious lymphatic cancer, which has caused Mr. Hamm's lymph nodes to unpredictably swell. According to Dr. Heath, "If there are enlarged lymph nodes surrounding the veins in his neck, chest, or groin, it would likely complicate or thwart attempts to obtain central venous access." Preliminary Report of Mark. J. S. Heath, M.D.,  ¶14. Establishing central venous access is difficult and should be performed by a physician, particularly in cases in which the inmate, like Mr. Hamm, has several other medical complications, as comprehensively detailed above.

## CAUSE OF ACTION

I.   **The State's Proposed Use of Lethal Injection to Execute Mr. Hamm Creates a Substantial Risk that Mr. Hamm Will Experience Severe Pain and Suffering in Violation of the Eighth Amendment to the United States Constitution.**

1.   The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." It is well established that, to be constitutional, a punishment must not be "incompatible with the evolving standards of decency that mark the progress of a maturing society" and may not "involve unnecessary or wanton infliction of pain." *Estelle v. Gamble*, 492 U.S. 97, 102 (1976); *see also In re Kemler*, 136 U.S. 436, 447 (1890) ("[P]unishments are cruel when they involve torture or a lingering death.").

2.    To establish that a future harm will violate the Eighth Amendment, "the conditions presenting the risk must be '*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'" *Baze*, 553 U.S. at 50 (citing *Helling v. McKinney*, 509 U.S. 25, 33, 34-35 (1993)). In the context of lethal injection, "there must be a 'substantial risk of serious harm,' and 'objectively intolerable risk of harm,' that prevents prison officials from pleading that they were 'subjectively blameless for the purposes of the Eighth Amendment.'" *Id*. at 1531 (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

3.    In addition to showing a "substantial risk of serious harm," an inmate challenging a method of execution must also identify an alternative method that is "feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain." *Id.* at 1532. If an inmate offers an alternative that meets the *Baze* criteria and "a State refuses to adopt such an alternative in the face of these documented advantages, without a legitimate penological justification for adhering to its current method of execution, then a State's refusal to change its method can be viewed as 'cruel and unusual' under the Eighth Amendment." *Id.*[2]

4.    Mr. Hamm can make both of these showings.

### A. The State's Use of Lethal Injection to Execute Mr. Hamm is Sure or Very Likely to Result in the Experience of Severe Pain and Suffering.

5.    There is a "substantial" and "objectively intolerable" risk that Mr. Hamm will experience severe pain and suffering if Alabama proceeds to execute him by lethal injection, in violation of his Eighth Amendment rights. Mr. Hamm's serious and worsening cancer, compounded with his

---

[2] Notably, this decision does not impose any requirement that the proffered alternative be allowed by statute. In fact, this language implies the exact opposite. *See Arthur v. Dunn, Comm'r, Alabama Dep't of Corr.*, 137 S.Ct. 725, 729 (2017) (Sotomayor, J., dissenting from denial of certiorari) ("The decision below turns this language [of *Baze*] on its head, holding that if the State *refuses* to adopt the alternative legislatively, the inquiry ends. That is an alarming misreading of *Baze*.").

extensive prior medical history and compromised veins, create a considerable likelihood of unnecessary and excruciating pain during the administration of a lethal injection.

6.     Because Mr. Hamm has severely compromised veins, it will be exceedingly difficult, if not impossible, for prison personnel to establish reliable peripheral intravenous access during the lethal injection procedure. If ADOC attempts to access Mr. Hamm's peripheral veins anyway, they will very likely be unsuccessful and will, in the process, cause pain to Mr. Hamm by repeatedly attempting to insert needles into inaccessible veins.

7.     ADOC will instead attempt to establish percutaneous central venous access. As described above, this technique is much more difficult and requires a much higher level of training than is required for conventional peripheral intravenous access. In addition to the general risks that the technique poses, the procedure presents specific problems for Mr. Hamm, given his unique medical condition. As Dr. Heath concluded after examining Mr. Hamm, "there may be significant involvement and enlargement of lymph nodes in other areas of [Mr. Hamm's] body, including his neck, chest, and groin. If there are enlarged lymph nodes surrounding the veins in his neck, chest, or groin, it would likely complicate or thwart attempts to obtain central venous access." *See* Preliminary Report of Mark. J. S. Heath, M.D., ¶14. As such, central venous access for Mr. Hamm is likely to be extremely difficult, dangerous, and bloody because of the combination of Mr. Hamm's lymphatic cancer and the lack of a fully equipped hospital operation-room set up at Holman Prison.

8.     There is clear evidence that Mr. Hamm will almost certainly be subjected to an unconstitutional amount of pain and suffering. This risk is objectively intolerable and cannot be countenanced by the Eighth Amendment, particularly when there exist readily available and more humane alternatives.

###### B. An Oral Injection of a Lethal Drug Is a Feasible, Readily Implemented Alternative that Would Eliminate the Substantial Risk of Severe Pain Arising from Mr. Hamm's Unique Medical Conditions

9.    As an alternative method of execution, Mr. Hamm proposes an oral injection of a lethal drug cocktail, including alone or in combination, morphine, valium, pentobarbital, secobarbital, phenobarbital, chloralhydrate, lorazepam, and/or midazolam. An oral form of lethal injection is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain" associated with intravenous administration of the lethal injection in Mr. Hamm's case. *Baze*, 553 U.S. at 50.

10.    Alabama statute does not specify the method of lethal injection that the State is authorized to use and does not limit the mode of execution to solely intravenous injection. The statute states only that "[a] death sentence shall be executed by lethal injection." Ala. Code § 15-18-82.1(a). The definition of "injection" is not confined to only intravenous injections. The Oxford English Dictionary defines "injection" as "[t]he action of forcing a fluid, etc. into a passage or cavity, as by means of a syringe, or by some impulsive force." An oral form of lethal injection is therefore authorized by Alabama statute and fulfills the Eleventh Circuit's requirement that the alternative method of execution be permitted by state law. *Arthur v. Comm'r, Alabama Dep't of Corr.*, 840 F.3d 1268 (11th Cir. 2016). By contrast to other states that explicitly narrow the term injection to venous injection, the Alabama statute clearly allows for other forms of injection, such as oral injection.

11.    An oral dose of a lethal drug cocktail is feasible and readily implemented. For example, morphine, valium, pentobarbital, phenobarbital, and midazolam are frequently administered orally and they are currently accessible to the ADOC. Moreover, an oral injection would require less medical expertise, equipment, and risk on the part of ADOC personnel, making it much more

19

feasible than an intravenous injection. An oral injection of the drug would not only eliminate the painful and bloody potential consequences of intravenous injection for Mr. Hamm but also reduce the risk of Hepatitis C transmission to ADOC staff.

## CONCLUSION

Mr. Hamm respectfully submits that he has met his burden in this case to show that Alabama's planned use of lethal injection will cause him excruciating pain, in violation of the Eighth Amendment's prohibition on cruel and unusual punishment. First, Mr. Hamm has established a "substantial risk of serious harm," given that peripheral venous access will be impossible and central venous access poses serious risks, both in general and as applied specifically to Mr. Hamm. *Baze*, 552 U.S. at 50. Second, Mr. Hamm has provided an alternative that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain," namely an oral injection of a lethal drug cocktail, which will cause a quick and painless death for Mr. Hamm. *Id.* at 1532. Mr. Hamm has met his burden under Alabama law and, as such, respectfully requests that this Court grant relief.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff Doyle Lee Hamm respectfully requests that this Court:

A. Enter a declaratory judgment that Defendants' plans to execute Mr. Hamm by lethal injection violate Mr. Hamm's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

B.  Grant injunctive relief to enjoin the Defendants from proceeding with the execution of

Mr. Hamm by a lethal injection, which will cause Mr. Hamm cruel and needless pain, in

violation of the Eighth Amendment.

C.  Grant any further relief as it deems just and proper.

This, the 13th day of December, 2017.

Respectfully submitted,

Bernard E. Harcourt
Bar Number: ASB-4316-A31B
Attorney for Plaintiff Doyle Hamm
COLUMBIA LAW SCHOOL
435 West 116th Street
New York, New York 10027
Telephone: (212) 854-1997
Fax: (212) 854-7946
Email: beh2139@columbia.edu

CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2017, I served a copy of the attached pleading by electronic mail to opposing counsel, Assistant Attorney General Beth Jackson Hughes at bhughes@ago.state.al.us.


BERNARD E. HARCOURT
*Counsel of Record*

# Appendix A

<u>Preliminary Report of Mark. J. S. Heath, M.D.</u>

1.      My name is Mark J. S. Heath.  I am a medical doctor with an active, licensed, full-time medical practice in New York State.  I am board certified in anesthesiology. I practice daily at the New York-Presbyterian/Columbia Hospital in New York City, where I provide anesthesia for open-heart surgeries. Core features of my daily practice include obtaining both peripheral and central intravenous (IV) access, the administration of large doses of anesthetic agents, and intensive monitoring to ensure that my patients are both safe and fully anesthetized. On average, I conduct these activities on more than one open-heart surgery every working day.  I am board certified in anesthesiology, and have been practicing within this specialty for 29 years (3 years of residency, 1.5 years of fellowship in cardiothoracic anesthesiology and research, and 24.5 years as an attending physician).  I hold an appointment as an Assistant Professor of Clinical Anesthesiology at Columbia University in New York City, where I teach medical students, residents, and fellows, primarily regarding the practice of anesthesiology in cardiothoracic cases.

2.      Because of my extensive experience in anesthesiology, I have been called upon to give expert medical opinion in a number of cases involving the use of lethal injection at both the federal and state level, including with the Federal Bureau of Prisons and in the correctional systems of California, Florida, Ohio, and Texas, among others. I have previously been involved in the federal litigation surrounding the lethal injection of inmate David Nelson in the state of Alabama, as well as in the cases of other Alabama inmates.

3.      At the request of counsel Bernard Harcourt I examined Mr. Doyle Hamm on Saturday, September 23, 2017, in the William E. Donaldson Correctional Facility in Bessemer, Alabama.

4.      Prior to the medical examination, Mr. Harcourt provided me with a copy of the medical records that he had received from Donaldson Correctional Facility that included diagnoses and descriptions of the care Mr. Hamm has received for his lymphatic cancer; as well as other medical reports Mr. Harcourt had obtained, including a report by Dr. Fred Dumas dated May 16, 2014; a follow up report by Dr. Dumas dated June 6, 2014; a report by Dr. Sandra Tincher dated July 14, 2014; and an affidavit by Dale G. Watson, PhD, dated July 19, 1999.

5.      I brought medical equipment to assist in the medical examination. Unfortunately, because of prison security at the front gate, I was courteously but insistently prevented from bringing the equipment into the prison. This limited my ability to perform a complete examination.

6.      I began my examination at approximately 1:45 pm on Saturday, September 23, 2017. Mr. Hamm was cooperative, although somewhat subdued in affect.  He appears gaunt and frail, and had a prominent facial lesion and deformity that was causing him pain, but he was not in acute distress.  He was breathing comfortably and able to converse and ambulate.  Because of equipment limitations, I was not able to measure vital signs. The medical examination was politely but firmly ended at 3:30pm by the correctional staff.

7.      I first obtained a medical history from Mr. Hamm.  I then assessed Mr. Hamm's peripheral veins, with and without a tourniquet.  I used Mr. Harcourt's necktie because I was not

permitted to bring a medical tourniquet into the prison.  Mr. Hamm has extremely poor

peripheral venous access. There are no accessible veins on his left upper extremity (arm/hand) or

either of his lower extremities (legs/feet).  He related that all of the veins on these extremities

were "used up" by chronic intravenous drug use.  There are no accessible peripheral veins on his

right arm.  On the dorsum of the right hand there is a small, tortuous vein that is potentially

accessible with a butterfly needle.  Insertion of an intravenous catheter into this vein would be

challenging and would have a high chance of rupturing the vein and being unsuccessful.  Mr.

Hamm related that this vein was previously accessed with a butterfly needle in order to inject

contrast dye for a CT scan to assess his facial/intracranial malignancy in 2014, prior to his cancer

treatments.  A butterfly needle is significantly easier to insert than an intravenous catheter

because it is thinner and sharper.  The nurse/technician failed to access the vein during the first

several attempts, but was ultimately able to access it with that butterfly needle.  The access was

"positional", meaning that the ability to infuse fluid through the needle was intermittent and

depended on the precise depth and angle of the needle.  The nurse/technician injected the

contrast into this vein while standing right next to his hand and slowly and carefully infused the

contrast at a slow and cautious rate.  This is the appropriate and necessary practice when

injecting fluid into a tenuous vein.  Mr. Hamm also related that this vein was accessed with great

difficulty in 2014 when he underwent a surgical procedure to biopsy the malignancy behind his

left eye.  One practitioner (perhaps a CRNA (Certified Registered Nurse Anesthetist)) was

unable to access the vein.  She called for assistance from a middle-aged man (perhaps a senior

anesthesiologist) who was, with difficulty, able to insert a very small intravenous catheter. Based

on my knowledge of previous Alabama lethal injection procedures and protocols, this small,

torturous vein on his right hand would not provide reliable peripheral venous access.

3

8.      Mr. Hamm relates that he has intermittent waxing and waning tumors on his chest, neck, and groins.  This likely represents lymphadenopathy (swollen lymph nodes) related to his lymphatic malignancy.  There are many other possible causes of lymphadenopathy, and the only way to determine the actual cause would be to biopsy one or more of these lesions.  The extent of these lesions could be assessed with diagnostic studies such as a CT scan, an MRI, or a PET scan.

9.      Because of equipment limitations it was not possible to assess the accessibility of the deep veins in Mr. Hamm's neck (internal jugular vein), chest (subclavian vein (behind the collar bone)), or groin (femoral veins).

10.     Mr. Hamm has a facial defect under his left eye.  There is a discolored lesion with diffuse margins, approximately 2-3 cm in diameter.  The lesion is tender, limiting my ability to palpate the underlying bone.  There is likely a bone defect in the infraorbital margin (the bone under the eye), in the region of the junction of the zygoma and maxilla.  This region of his face (in lay terms, his left cheek) is partially collapsed, resulting in prominent facial asymmetry.  As with the lymphadenopathy described above, a biopsy and imaging diagnostic study would be needed in order to assess the cause and extent of this lesion.

11.     In October 2006, I was present at Holman Prison when Mr. David Nelson was examined by a cardiac anesthesiologist.  Mr. Nelson's situation was very similar to Mr. Hamm's, in that his peripheral venous access was compromised by prior intravenous drug abuse. In Mr. Nelson's

case, a special master was appointed to supervise the litigation.  The magistrate approved an examination by an Alabama-licensed board certified practicing cardiothoracic anesthesiologist, Dr. Warren Bagley, to assess Mr. Nelson's veins.  I was present during that examination.  Dr. Bagley inspected Mr. Nelson's peripheral veins and central veins using physical exam and ultrasonography.  Based on my examination and finding of very poor venous access in Mr. Hamm, my opinion is that lethal injection should not be attempted without first obtaining an examination such as that performed by Dr. Bagley on Mr. Nelson.

12.     Based on my examination of Mr. Hamm on September 23, 2017, and review of his medical records, I am of the opinion that there are two significant medical problems that require further review before attempting a lethal injection.

13.     First, my examination revealed that Mr. Hamm has extremely poor peripheral vein access and that it very likely that the prison will need to resort to obtaining central venous access.  It is extremely doubtful, given the way that the correctional staff in Alabama administers the anesthetic agents from another room at distance from the inmate rather than at his bedside, that they will be able to achieve peripheral IV access. To the best of my knowledge, Alabama has limited experience with obtaining central vein access for lethal injection procedures.

14.     Second, Mr. Hamm has active B-cell lymphoma, a form of cancer that involves the lymph nodes.  A large tumor was diagnosed in 2014 and extended from his left eye into multiple areas of the skull behind the face, and through the skull into the middle cranial fossa (the area surrounding the temporal lobe of the brain).  In 2014 he also had enlarged lymph nodes in his

5

chest, and it is unclear whether these nodes were or are involved in the malignant process.  The lymphoma was treated with radiation and medication, with some improvement; however, recent reported symptoms indicate that the malignancy has returned.  There appears to have been no follow-up evaluation to determine whether the cancer has spread into lymph nodes beyond his face and skull.  Lymphoma, like other cancers, is a progressive disease if not cured.  At this point, there may be significant involvement and enlargement of lymph nodes in other areas of his body, including his neck, chest, and groin. If there are enlarged lymph nodes surrounding the veins in his neck, chest, or groin, it would likely complicate or thwart attempts to obtain central venous access.

15.     In addition to the pain that would be caused by repeated futile attempts to obtain IV access, there is the risk that the execution team might inadvertently inject the execution drugs into a catheter that is not properly situated in the lumen of the intended vein.  If this occurs the execution drugs will infiltrate in the tissue around the vein, and it will not exert its full anesthetic effect.  The paralytic drug will very likely be absorbed from the tissue into the circulation more rapidly than the anesthetic drug, which will cause Mr. Hamm to become paralyzed and consciously suffocate.  This would be an agonizing death.

16.     In summary, the progressive nature of Mr. Hamm's cancer warrants that a contemporary evaluation of any cancer spread be undertaken before execution is contemplated.  In particular, no execution should be contemplated without imaging the central veins to determine whether lymph nodes surrounding these veins are enlarged from the lymphoma. Mr. Hamm's difficult peripheral venous access makes it highly likely that an execution by lethal injection cannot

proceed without obtaining central venous access.  It is not clear whether the Alabama prison is prepared to perform central venous cannulation, particularly in light of the possibility of malignant (cancerous) lymph nodes impeding the procedure. I have not seen the exact protocol for venous access for lethal injection from the state of Alabama, but based on what I know from the David Nelson case, it is my opinion that the state is not equipped to achieve venous access in Mr. Hamm's case. Mr. Hamm's difficult IV access greatly increases the likelihood of an inhumane execution due to infiltration of the execution drugs, with the onset of paralysis preceding the attainment of adequate anesthesia.

17.     This report represents the chief findings and opinions resulting from my examination of Mr. Hamm. I reserve the right to amend my opinions should the advent of additional information so warrant.

_____
Mark J. S. Heath, M.D.
October 1, 2017