FILED
2018 Jan-16 PM 06:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA**

| | |
|---|---|
| DOYLE LEE HAMM,<br><br>Plaintiff,<br><br>v.<br><br>JEFFERSON S. DUNN, Commissioner, Alabama Department of Corrections;<br><br>CYNTHIA STEWART, Warden, Holman Correctional Facility;<br><br>LEON BOLLING, Warden, Donaldson Correctional Facility;<br><br>OTHER UNKNOWN EMPLOYEES AND AGENTS, Alabama Department of Corrections;<br><br>Defendants. | Civil Action No. 2:17-cv-02083-KOB<br><br>**EXECUTION SCHEDULED**<br><br>**Thursday, February 22, 2018** |

**FIRST AMENDED COMPLAINT**

Plaintiff Doyle Lee Hamm, by and through his counsel, hereby files his First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), requesting this Court enforce his constitutional rights and issue declaratory and injunctive relief under 42 U.S.C. § 1983 and the Eighth Amendment to the U.S. Constitution by ordering Defendants to not carry out their plan to lethally inject him and to immediately cease and desist from planning or threatening Mr. Hamm with intravenous lethal injection. Mr. Hamm brings two causes of action pursuant to 42 U.S.C. § 1983 and the Eighth Amendment. First, Mr. Hamm's unique medical conditions will almost certainly cause him to suffer a painful, bloody, and prolonged death in violation of the

Eighth Amendment if Defendants pursue their plan to execute him by intravenous lethal injection. Second, the combined effect of defendants' actions throughout Mr. Hamm's confinement have inflicted unnecessary and wanton pain upon him, amounting to cruel and unusual punishment in violation of the Eighth Amendment.

## INTRODUCTION

Doyle Lee Hamm has been on Alabama's death row for thirty years and is now battling lymphatic cancer. A few years ago, in 2014, Mr. Hamm was diagnosed with a large cell lymphoma behind his left eye and in his cranium—specifically in the left orbit and skull base. Mr. Hamm was treated with massive radiation therapy to his cranium and other medication treatments. As a result of his cancer, cancer treatments, extensive prior medical history, current medical condition, and age, Mr. Hamm's veins are severely compromised. Despite his lymphatic cancer and impaired veins, the Alabama Attorney General is moving forward with execution by intravenous lethal injection and the Alabama Supreme Court has set an execution date for February 22, 2018.

If Defendants proceed with their plan to lethally inject Mr. Hamm, he will suffer an agonizing, bloody, and painful death. Mr. Hamm's serious and deteriorating medical condition poses an unacceptable risk that he will experience significant pain constituting cruel and unusual punishment in violation of the Eighth Amendment. Mr. Hamm is not here alleging that Alabama's lethal injection protocol is facially unconstitutional. He asserts only that the lethal injection protocol, as applied to him, will violate his rights because of his unique and serious medical conditions. He also alleges that Defendants are now engaged in cruel and unusual punishment through their combined practices of threatening a lethal intravenous injection and

pricking and prodding Doyle Hamm with needles for blood samples in a situation where Mr. Hamm has been awaiting execution for 30 years, is struggling against cancer, is facing a tortuous death because he has no veins, is suffering physical pain from lack of medical treatment, and is being constantly being reminded of his imminent unnecessarily painful death through frequent and repeated drawings of his blood.

Due to his lengthy medical history, cancer, cancer treatment, current medical condition, and age, Mr. Hamm's veins are severely compromised, making traditional peripheral intravenous access extremely difficult, if not impossible. In the nearly certain scenario that the Alabama Department of Corrections ("ADOC") is unable to access Mr. Hamm's peripheral veins, prison personnel will likely attempt to access a central vein. Accessing a central vein involves a complicated and dangerous procedure made much riskier by Mr. Hamm's serious lymphatic cancer. Finding a central vein is difficult even for capable medical professionals and establishing access risks a bloody and excruciating experience for Mr. Hamm. The procedure requires a level of training, experience, and supervision that prison personnel are highly unlikely to possess. Moreover, every central vein is located near the human body's largest clusters of lymph nodes and Mr. Hamm's lymphatic cancer has caused his lymph nodes to unpredictably swell, making central venous access substantially riskier and more difficult in this case. If the ADOC attempts to establish venous access for the purposes of lethal injection, there is a "substantial risk of serious harm" that is "objectively intolerable," in violation of the Eighth Amendment. *Baze v. Rees*, 553 U.S. 35, 50 (2008).

In addition to establishing that Alabama's protocol for venous access for lethal injection poses an unconstitutional risk of harm to him, Mr. Hamm also offers an alternative method of lethal injection that is "feasible, readily implemented, and in fact significantly reduces a

substantial risk of severe pain." *Baze*, 553 U.S. at 50. Mr. Hamm proposes that, instead of the intravenous method of lethal injection, the ADOC execute him by a ten-gram dose of secobarbital injected orally in four ounces of liquid or, alternatively, a drug cocktail known to doctors as "DDMP II," which is composed of 1 gram of diazepam, 50 milligrams of digoxin, 15 grams of morphine sulfate, and 2 grams of propranolol, injected orally.

This alternative is permissible under Alabama law. *See Arthur v. Comm'r, Alabama Dep't of Corr.*, 840 F.3d 1268 (11th Cir. 2016); *Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853 (11th Cir., 2017).[1] Alabama law currently authorizes two methods of execution: lethal injection and electrocution. *See* Ala. Code § 15-18-82.1(a). Mr. Hamm has waived the electrocution option, as he did not make the choice in writing within 30 days of the certificate of

[1] The holding in *Arthur* has faced a significant number of challenges in the short time since it was decided. Last year, Justice Sotomayor, joined by Justice Breyer, dissented from the Court's denial of certiorari in the *Arthur* case. *Arthur v. Dunn, Comm'r , Alabama Dep't of Corr.*, 137 S.Ct. 725 (2017). Justice Sotomayor expressed grave concern that, under the Eleventh Circuit's "alarming misreading" of Supreme Court precedent, "even if a prisoner can prove that the State plans to kill him in an intolerably cruel manner, and even if he can prove that there is a feasible alternative, all a State has to do to execute him through an unconstitutional method is to pass a statute declining to authorize any alternative method." *Id*. at 729. In two cases brought before the Eleventh Circuit this year, Judge Wilson, who also dissented in *Arthur*, has continued to argue that *Arthur* was wrongly decided – an argument that has gained traction with other Eleventh Circuit judges. *See Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 877 (11th Cir. 2017) (Wilson, J., concurring); *Ledford v. Comm'r, Georgia Dep't of Corr.*, 756 F.3d 1327 (11th Cir. 2017) (Wilson, J., dissenting) (joined by Judges Martin, Rosenbaum, and Pryor (who also authored a separate dissent)). Other courts have also expressed their concern with the *Arthur* holding. *See McGehee v. Hutchinson*, No. 17-00179, 2017 WL 1399554 at *39 (E.D. Ark., Apr. 15, 2017), *vacated on other grounds by McGehee v. Hutchinson* (*McGehee II*), 854 F.3d 488 (8th Cir. 2017) (en banc) (finding that the "Eleventh Circuit's limitation of alternative methods to those presently permitted under state law finds no textual basis in *Baze* and *Glossip*"); *In re Ohio Execution Protocol*, 860 F.3d 881, 910 (6th Cir. 2017) (Stranch, J., concurring in the dissent) (citing Justice Sotomayor's dissent in *Arthur v. Dunn*). Mr. Hamm maintains that, as a legal matter, the state may not implement a method of execution that is cruel and unusual, regardless of the feasibility of any alternative method of execution. *See Gregg v. Georgia*, 428 U.S. 153 (1976) (punishment *must not* be excessive in violation of the Eighth Amendment). Therefore, this Court may not grant summary judgment on the feasibility of the alternative alone if it has been shown that there is a genuine issue of material fact as to whether lethal injection has a substantial risk of causing Mr. Hamm severe pain.

judgment, pursuant to § 15-18-82.1(b), so he is foreclosed from offering any alternative but lethal injection. However, an oral injection of a lethal drug constitutes an "injection," so such a method is allowed under current Alabama law. A ten-gram dose of secobarbital injected orally in four ounces of liquid or a drug cocktail of "DDMP II," injected orally, are readily implemented alternatives that will eliminate the significant likelihood of pain and suffering associated with an intravenous injection in Mr. Hamm's case.

Defendants have also now violated Mr. Hamm's rights by inflicting unnecessary and wanton pain upon him in violation of the Eighth Amendment. Defendants' following actions, when taken together, amount to cruel and unusual punishment: (1) confining Mr. Hamm on death row for thirty years; (2) pursuing an execution despite Mr. Hamm's cancer and deteriorating health; (3) failing to treat Mr. Hamm's cancer and causing him to suffer unnecessary pain; (4) pursuing an execution by intravenous lethal injection despite Mr. Hamm's severely compromised veins; and (5) attempting to insert needles in and draw blood from Mr. Hamm's severely compromised veins, causing unnecessary physical and emotional pain. Combined, these actions have amounted to a "punishment[] of torture" that have "superadded" to Mr. Hamm's punishment in violation of the Eighth Amendment. *Weems v. United States*, 217 U.S. 349, 370 (1910).

## JURISDICTION

1. Federal question jurisdiction over this matter arises under 42 U.S.C. § 1983, 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 2201, and 28 U.S.C. § 2202.

## VENUE

2. Venue is appropriate in the Northern District of Alabama under 28 U.S.C. § 1391(b) as plaintiff Doyle Hamm is currently located in Donaldson Correctional Facility in Bessemer, Alabama.

## THE PARTIES

3. Plaintiff Doyle Lee Hamm is a United States citizen and resident of the State of Alabama. He is a death-sentenced prisoner currently being held in the custody of defendants at the Donaldson Correctional Facility in Bessemer, Alabama.

4. Defendant Jefferson S. Dunn is the Commissioner of the Alabama Department of Corrections, which is headquartered in Montgomery, Alabama. Mr. Dunn is responsible for overseeing operations at the Alabama Department of Corrections and has an obligation to ensure that all executions are carried out in compliance with the United States Constitution.

5. Defendant Cynthia Stewart is the Warden of Holman County Correctional Facility in Atmore, Alabama, where Alabama conducts its executions by lethal injection. Alabama statute requires the Warden of Holman Correctional Facility, or a designated employee, to administer the lethal injection. Ala. Code § 15-18-82. The Warden, or the designated employee, has a duty to carry out the lethal injection in compliance with the United States Constitution.

6. Defendant Leon Bolling is the Warden of Donaldson County Correctional Facility in Bessemer, Alabama, where Doyle Hamm is currently imprisoned. The Warden, or the designated employee, has a duty to carry out Doyle Hamm's punishment and incarceration in compliance with the United States Constitution.

7. Other Unknown Employees and Agents of the Alabama Department of Corrections are involved in the implementation of the Department's execution procedures. Mr. Hamm does not yet know the identity of these persons.

8. All defendants are being sued in their official capacities. The named defendants are United States citizens and residents of Alabama.

## PROCEDURAL HISTORY

9. Mr. Hamm was convicted and sentenced to death by the Circuit Court of Cullman County in 1987. On direct appeal, the Alabama Court of Criminal Appeals and the Supreme Court of Alabama affirmed Mr. Hamm's conviction and death sentence. *Hamm v. State*, 564 So. 2d 453 (Ala. Crim. App. 1989), *aff'd* 564 So. 2d 469 (Ala. 1990). The United States Supreme Court then denied Mr. Hamm's petition for writ of certiorari to the Alabama Supreme Court in 1990. *Hamm v. Alabama*, 498 U.S. 1008 (1990).

10. On December 3, 1991, Mr. Hamm filed a Rule 32 state post-conviction petition. In 1999, the trial court held an evidentiary hearing and subsequently denied the petition. Despite serious constitutional questions about the court's order denying the petition, the Alabama Court of Criminal Appeals affirmed the denial. *Hamm v. State*, 913 So. 2d 460 (Ala. Crim. App. 2002). Both the Alabama Supreme Court and the United States Supreme Court denied Mr. Hamm's petition for writ of certiorari.

11. Mr. Hamm then filed for federal habeas corpus in May 2006. The district court denied the petition on March 27, 2013. *Hamm v. Allen*, 2013 WL 1282129 (N.D. Ala., 2013). The Eleventh Circuit affirmed the denial of the habeas petition. *Hamm v. Comm'r*, 620 F. App'x 752 (11th Cir.

2015). The United States Supreme Court then denied Hamm's petition for writ of certiorari. *Hamm v. Allen*, 137 S. Ct. 39 (2016).

12. On December 13, 2017, the Supreme Court of Alabama entered an order authorizing Mr. Hamm's execution on February 22, 2018. Defendants have scheduled his execution for February 22, 2018.

**FACTUAL BACKGROUND**

13. Doyle Hamm has a long and complicated medical history. Most recently, Mr. Hamm has been diagnosed with a severe and worsening cranial and lymphatic cancer. Mr. Hamm also has Hepatitis C, a history of seizures and epilepsy, multiple significant head injuries, and severely compromised veins due to years of intravenous drug use.

**Mr. Hamm's Cancer**

14. Mr. Hamm is suffering from a serious cranial and lymphatic cancer. He is not malingering.

15. Mr. Hamm's cancer was originally identified in February 2014, when a pathology report diagnosed "a poorly marginated mass within the left orbit [of the skull] with both intraconal and extraconal components. This appears to extend through the orbital apex via the superior and inferior orbital fissures both of which appear enlarged. The left foramen rotundum is asymmetrically enlarged. The cortex along the lateral aspect of the left vidian canal appears mildly slightly eroded. The lesion probably extends into the left cavernous sinus. There is mild left proptosis." *See* Doyle Hamm Donaldson Medical Records, p. 189. In other words, the doctors found that Mr. Hamm had a large tumor in the back of the left eye socket, where the nerves from the brain go to the eye; and that this tumor protruded through the holes (superior and inferior orbital fissures) on both the brain and eye side. The doctors reported their preliminary impression: "Left orbital neoplasm with possible

perineural tumor spread to the left cavernous sinus and left masticator space [of the skull].” *See* Doyle Hamm Donaldson Medical Records, p. 189-190. The pathology reports indicated that these findings were consistent with a “B-cell lymphoma,” a type of blood cancer in the lymph nodes. *See* Doyle Hamm Donaldson Medical Records, p. 165. Another report at the time determined that “The epidermis is ulcerated. Budding from the dermal epidermal junction [where the outer (epidermal) and inner (dermal) sections of the skin meet] are geometrically shaped tumor islands consisting of basaloid cells [this suggests it is a lymphoma]. The tumor islands are mitotically active and demonstrate peripheral palisading. There is peritumoral reactive fibroplasia and cellularity.” *See* Doyle Hamm Donaldson Medical Records, p. 174.

16. In April 2014, a CT scan confirmed that the “Left orbit [of the skull] is abnormal, large soft tissue masses seen in the left orbit resulting in expansion of the bony orbit. Proptosis seen. This mass is surrounding the left optic nerve complex. Posteriorly, the mass extends up to the orbital apex. There is also extension through the inferior orbital fissure into the pterygopalatine fossa, masticator space and the buccal space. There is also suggestion of extension to the left vidian canal” *See* Doyle Hamm Donaldson Medical Records, p. 151. In other words, the cancer extended into the eye through the holes where the nerves go through, and down into the spaces near the cheek bone, the masticator space and the buccal space. This led to a preliminary diagnosis by Dr. Brian Adler of the Brookwood Cancer Center in Birmingham, Alabama, of a “MALT lymphoma or marginal zone lymphoma,” and the recommendation for immediate radiation therapy and the possibility of “a Rituxan based regimen that will probably include some cytotoxic chemotherapy.” *See* Doyle Hamm Donaldson Medical Records, p. 135. The doctors also found at that time, on examination of Mr. Hamm’s abdomen, numerous “granulomata throughout the spleen” and abnormal lymph nodes in the abdomen. *See* Doyle Hamm Donaldson Medical Records, p. 140.

17. In May 2014, the doctors at Brookwood Cancer Center confirmed a primary diagnosis of "Large cell lymphoma unspecified site, Diagnosed 2014 (Active)" and indicated that it was aggressive and fast growing. *See* Brookwood Hamm Report from 2014, p. 10. The doctors reported that the "scans demonstrated a large mass in the retro-orbital area on the left extending into the masseter space [cavity in face above jaw, under temple]. There was a suggestion of widening of the neural foramen [space in spine through which the spinal cord runs]. In the chest were noted numerous abnormal lymph nodes [and] a few small nodes were seen in the abdomen." *See* Brookwood Hamm Report from 2014, p. 10.

18. In June 2014, the doctors confirmed "the presence of a tumor extending through the foramina into the pterygoid space and into the middle cranial fossa. There is involvement of the cavernous sinus as well as extension into the left side of the nasopharynx." *See* Doyle Hamm Donaldson Medical Records, p. 111. Note that the "nasopharynx" is the back of the throat and the "foramina" is plural of foramen, which means a cavity in the bone; the spinal cord goes through a foramen in this area, so the cancer was right next to the spinal cord. The fact that the cancer was nearing the middle cranial fossa suggests that it was entering the cranial cavity. The pterygoid space is the space where the head and spine meet. The middle cranial fossa is the space in the skull above where the spine meets the head. The doctors reported that "The patient appears chronically ill." *See* Doyle Hamm Donaldson Medical Records, p. 111. The doctors also indicated that "There is some risk of involvement of the spinal fluid." *Ibid.* The treating physician at Brookwood said he would "request approval from the prison medical clinic for the patient to have a lumbar puncture with cytology. In the interval I recommended that we proceed with radiation therapy as he is going to require some form of local treatment even if he takes systemic chemotherapy." *Ibid.*

19. The different diagnoses all concur that the cancer spread from inside the left eye socket

(the "left orbit"), through the holes where the optic nerves travel and back into the cavities under the cheek bone and towards the spot where the spinal cord meets the skull.

20. In July 2014, Mr. Hamm underwent radiation therapy, specifically "IMRT to 40Gy over 20 fractions for orbital lymphoma completed on July 11, 2014." *See* Brookwood Hamm Report from 2014, p. 6.

21. By September 2014, the doctors at Brookwood felt that there had been some improvement. They reported that Mr. Hamm had "completed 40 gray for a lymphoma involving the left orbit and skull base. He is feeling better at this time. Constitutional: Complains of poor appetite and major fatigue. Eyes: Complains of double vision with the left eye and visual difficulties of the left eye that is also dry and red. Complains of some pain in the left eye but has gotten better." *See* Brookwood Hamm Report from 2014, p. 3.

22. One year later, in September 2015, Mr. Hamm showed some improvement, even though there was evidence from the tests of "Abnormal enhancement […] in the left orbit with involvement in the left pterygopalatine fossa and left infratemporal fossa/masticator space region. Abnormal enhancement is also seen in the inferior orbital fissure and in foramen ovale, and along foramen rotundum on the left." *See* Doyle Hamm Donaldson Medical Records, p. 629. But these "areas of abnormal enhancement are improved in appearance when compared with 3/10/2015 and markedly improved from 9/29/2014." *Ibid.*

23. However, beginning in March 2017, the cancer has come back and Mr. Hamm has been experiencing lymphadenopathy associated with his earlier diagnosed and treated skull-orbital cancer. In March or April 2017, Mr. Hamm was seen by a doctor in Jasper, Alabama, who conducted a biopsy and found that it was cancerous. The doctor ordered surgery, but Mr. Hamm has not yet been allowed to return for surgery. Mr. Hamm apparently also now has a lesion on his face that is the size

of a quarter. *See* Preliminary Report of Mark. J. S. Heath, M.D., attached as Appendix A, ¶ 10. On March 7, 2017, Mr. Hamm was complaining of "'knots' on my chest" and the medical team was reporting that "These feel like lymph nodes." *See* Doyle Hamm Donaldson Medical Records, p. 453. On March 2017, Mr. Hamm reported that he "Need[s] to see the doctor I have lumps in my chest." *See* Doyle Hamm Donaldson Medical Records, p. 472; see also *ibid.,* p. 470 ("lumps in chest").

24. A recent visual examination of Mr. Hamm revealed two abnormal lumps on Mr. Hamm, one under his chin on the left side and one on the back right of his neck below his right ear. *See* Report by Nicola Cohen in Update No. 1 filed with this Court on September 1, 2017. Mr. Hamm currently is experiencing lymphadenopathy in his neck, chest and abdomen, which is likely associated with worsening lymphoma cancer. He is in pain and is taking a massive amount of prescribed pain relievers. Mr. Hamm is not malingering his condition.

**Mr. Hamm's Severely Compromised Veins**

25. As a result of a long and complicated medical history made worse by cranial and lymphatic cancer and serious cancer treatments, and old age, Mr. Hamm's veins are most likely inaccessible for the purposes of intravenous lethal injection. It will be extremely difficult to achieve venous access and remotely administer the anesthetic drugs at Holman Prison. Moreover, because of his lymphatic cancer, which causes inflamed abnormal lymph nodes around arteries and veins, it will be anatomically difficult and extremely dangerous to attempt accessing Mr. Hamm's central veins. As a result, there is a substantial likelihood that the Alabama Department of Corrections will not be able to accomplish a successful execution in compliance with the Eighth Amendment.

26. Dr. Mark Heath is a leading anesthesiologist in this country. He has almost 30 years of experience, and practices at one of the leading hospitals in the country, performing on a daily basis anesthesia for open-heart surgeries. Dr. Heath practices at the New York-Presbyterian/Columbia

Hospital in New York City, where his duties include, on a daily basis, "obtaining both peripheral and central intravenous (IV) access, the administration of large doses of anesthetic agents, and intensive monitoring to ensure that [his] patients are both safe and fully anesthetized." *See* Preliminary Report of Mark. J. S. Heath, M.D., ¶1. Dr. Heath has practiced anesthesiology for 29 years and is a professor of clinical anesthesiology at Columbia University in New York City. *See ibid.,* ¶1.

27. Dr. Heath also has experience with intravenous lethal injection procedures. Because of his expertise as an anesthesiologist, Dr. Heath has been "called upon to give expert medical opinion in a number of cases involving the use of lethal injection at both the federal and state level, including with the Federal Bureau of Prisons and in the correctional systems of California, Florida, Ohio, and Texas, among others." *Ibid.,* ¶2. Specifically, Dr. Heath was an expert in the Federal District Court litigation surrounding the lethal injection of inmate David Nelson in the State of Alabama, and was present when Mr. Nelson was examined by a cardiac anesthesiologist at Holman Prison in 2006.

28. On Saturday, September 23, 2017, Dr. Heath conducted an extensive medical examination, including a lengthy medical history interview and a substantial physical exam of Mr. Hamm. Dr. Heath concluded, based on his extensive experience obtaining venous access at one of the top-ranked hospitals in the country, that (1) Mr. Hamm's peripheral veins are damaged and will be extremely difficult to access for lethal injection; and (2) access to his central veins through his groin or neck is equally problematic because of Mr. Hamm's cancerous lymphadenopathy.

29. Dr. Heath found no usable veins on Mr. Hamm's left arm and hand, left leg and foot, right leg and foot, and right arm. Dr. Heath found one "small, tortuous vein" on his right hand "that is potentially accessible with a butterfly needle"; however, lethal injection requires a larger intravenous catheter, much larger than a butterfly needle. In a subsequent report on January 16, 2018, Dr. Heath emphasized that "It is very important to understand that it is easier and simpler to

insert a needle to draw blood than it is to insert an intravenous catheter." *See* Report of Mark J.S. Heath, M.D., attached as Appendix B, ¶ 9. Dr. Heath explained that this is because a butterfly needle is "thinner and sharper than an intravenous catheter, which consists of a needle surrounded by a plastic tube." *Ibid.* Inserting a catheter into the small tortuous vein on Mr. Hamm's right hand, Dr. Heath concluded, would be dangerous and challenging, if not impossible. *Ibid.* Dr. Heath therefore concluded: "Based on my knowledge of previous Alabama lethal injection procedures and protocols, this small, tortuous vein on his right hand would not provide reliable peripheral venous access." Appendix A, Preliminary Report of Mark. J. S. Heath, M.D*.,* ¶7. In lay terms, Dr. Heath found no usable veins for lethal injection.

30. Dr. Heath also found that Mr. Hamm's lymphatic cancer would likely interfere with any attempt to access his central veins. As Dr. Heath explained, Mr. Hamm has "intermittent waxing and waning tumors on his chest, neck, and groins. This likely represents lymphadenopathy (swollen lymph nodes) related to his lymphatic malignancy." *Ibid.,* ¶8. This condition would likely interfere with accessing his central veins. Dr. Heath noted that "Lymphoma, like other cancers, is a progressive disease if not cured. At this point, there may be significant involvement and enlargement of lymph nodes in other areas of his body, including his neck, chest, and groin. If there are enlarged lymph nodes surrounding the veins in his neck, chest, or groin, it would likely complicate or thwart attempts to obtain central venous access." *Ibid.,* ¶14. As noted earlier, Mr. Hamm's medical records from Donaldson report a nurse or doctor finding knots that "feel like lymph nodes" and a visual inspection also observed lumps on Mr. Hamm's chin and neck. In addition, Dr. Heath reported, from his prior experiences in Alabama, that "To the best of my knowledge, Alabama has limited experience with obtaining central vein access for lethal injection procedures." *Ibid.,* ¶13. In lay terms, central venous access for Mr. Hamm is likely extremely difficult because of the combination

of Mr. Hamm's lymphatic cancer and the lack of a fully equipped hospital operation-room set up at Holman Prison.

31. Dr. Heath gave his expert opinion in conclusion: "I have not seen the exact protocol for venous access for lethal injection from the state of Alabama, but based on what I know from the David Nelson case, it is my opinion that the state is not equipped to achieve venous access in Mr. Hamm's case." *Ibid*., ¶16.

32. Mr. Hamm's case is additionally complicated by the fact that he has Hepatitis C, which is easily transmitted by blood. A messy and potentially bloody attempt at peripheral or central venous access puts the ADOC staff at great risk of contracting Hepatitis C.

33. In sum, venous access for Mr. Hamm, both peripheral and central, appears extremely difficult, and the attempt would likely be arduous, excessively painful, and in violation of the Eighth Amendment. Mr. Hamm does not have accessible peripheral veins and his lymphadenopathy means that his abnormal lymph nodes will likely present obstacles to access and severe complications. All of this would present a serious medical challenge even in a fully functional hospital operating room with a senior anesthesiologist and a team of different specialists and full medical equipment. At Holman Prison, the attempt would likely result in cruel and needless pain in violation of the Eighth Amendment. *Estelle v. Gamble,* 492 U.S. 97 (1976); *Baze v. Rees,* 553 U.S. 35 (2008); *Glossip v. Gross,* 135 S. Ct. 2726 (2015).

**Defendants' Failure to Provide Treatment for Mr. Hamm**

34. Mr. Hamm was diagnosed with lymphatic cancer in 2014, with evidence of possible abnormal nodes in his abdomen and chest, and his doctors recommended chemotherapy in addition to radiation. *See* Doc. 14, Ex. C (medical records from Brookwood Cancer Center), p. 5; Doc. 14, Ex. D (medical records from Donaldson Correctional Facility), pp. 151-52. Despite that, Mr. Hamm

has never received any treatment beyond the radiation for the cancerous mass behind his left eye and in his skull. In other words, defendants have never treated any of his other lymphatic cancer conditions.

35. Moreover, the medical records indicate that Mr. Hamm has had a cancerous lesion under his left eye since February 2014 and that, although his doctors have recommended that he receive surgery for that lesion since February 2014, he has remained untreated. *See* Doc. 14, Ex. C and X. The cancerous lesion was biopsied in February 2014, April 2017, and November 2017 and found to be cancerous. *See* Doc. 14, Ex. X (medical records obtained from Dr. John P. Donahue). Each time, the pathology report indicated cancer. Each time, Mr. Hamm was recommended for surgery. To date, he has still not been operated on.

36. Mr. Hamm was scheduled to undergo surgery on December 13, 2017. Instead of allowing him to receive this medically necessary surgery, Warden Leon Bolling called Mr. Hamm into his office to read him his death warrant.

37. The question of adequate medical care has plagued ADOC and is currently in active litigation in the Middle District of Alabama. The district court in Montgomery issued a searing 302-page opinion finding that ADOC did not provide adequate medical care to inmates on the mental health claims that were severed and litigated first. *See Braggs v. Dunn*, 257 F. Supp. 3d 1171 (M.D. Ala. 2017). That case has now moved on to address the medical claims. There are therefore significant questions overshadowing Mr. Hamm's situation about the medical care he is receiving. On this particular aspect, it is troubling that the lesion underneath his eye is specifically located in front of where he was later found to have ocular and cranial lymphoma. This may indicate that the lesion on his face is more closely connected to his lymphatic cancer than is currently believed.

38. Today, Mr. Hamm's lesion is getting deeper and bigger and, in his words, "is now stinging and burning all the time." Doc. 14, Ex. F at ¶7. During the medical examination of Mr. Hamm on September 23, 2017, Dr. Heath observed a quarter-sized, deep, and growing lesion on Mr. Hamm's left cheek that has literally gnawed a 4 to 5 millimeter deep hole into his left cheek. Dr. Heath described this lesion in his report as "a discolored lesion with diffuse margins, approximately 2-3 cm in diameter," and concluded that "there is likely a bone defect in the infraorbital margin (the bone under the eye), in the region of the junction of the zygoma and maxilla. This region of his face (in lay terms, his left cheek) is partially collapsed, resulting in prominent facial asymmetry." *See* Appendix A at 27 ¶10. The lesion is visible on Mr. Hamm's face in the undated photograph of him on the ADOC website. *See* Doc. 14, Ex. Y (counsel believes the photograph would have been taken in 2016 or 2017). Dr. Heath was prevented from bringing a digital camera or a film camera into the prison for his medical examination on September 23, 2017, so undersigned counsel drew a diagram of the lesion on Mr. Hamm's face. *See* Doc. 14, Ex. Z.

**Defendants' Excessive and Unnecessary Attempts to Access Mr. Hamm's Veins**

39. Since about October 2017, defendants have engaged in a practice of constantly trying to prick Mr. Hamm with needles, under the pretext of drawing blood. Defendants' affidavits of the nurse practitioners at Donaldson Correctional Facility reveal that Mr. Hamm has been subjected to needles on the following times:

1/ On October 3, 2017, Ms. McDonald stuck Doyle Hamm with needles two times. Doc. 12 Ex. F ¶5.

2/ On October 31, 2017, Ms. McDonald stuck Doyle Hamm with needles two times. Doc. 12 Ex. F ¶6.

3/ On November 7, 2017, Ms. McDonald again stuck Doyle Hamm with a needle. Doc. 12 Ex.

F ¶6.

4/ That same day, November 7, 2017, Ms. Wood stuck Doyle Hamm with a needle. Doc. 12 Ex. F ¶6; Doc. 12 Ex. G ¶4.

5/ On November 14, 2017, Ms. McDonald stuck Doyle Hamm with a needle. Doc. 12 Ex. F ¶6.

6/ On December 18, 2017, Ms. McDonald stuck Doyle Hamm with a needle. Doc. 12 Ex. F ¶4.

40. According to Mr. Hamm, "Lately, since a few months now, the nurses seem to be trying to stick needles in me to draw blood much more often than they were before. They seem to be doing this almost every other week." Doc. 14, Ex. F at ¶6. This appears to be a new development and it represents, for purposes of cruel and unusual punishment, the straw that broke the camel's back.

41. The accumulation of this new technique of punishment, in combination with the fact that Mr. Hamm has been in isolation on death row for thirty years awaiting his execution, that he is threatened with execution at a time when he is struggling against cancer, that the defendants are not properly treating his cancer so that he is in constant pain, and that he is threatened with intravenous lethal injection even though he does not have venous access, all together amount to cruel and unusual punishment.

**Alabama's Execution Protocol**

42. The Alabama Code prescribes that "[a] death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution." Ala. Code § 15-18-82.1(a). The choice to be executed by electrocution must be made "within 30 days after the certificate of judgment pursuant to a decision by the Alabama Supreme Court affirming the sentence of death." Ala. Code § 15-18-82.1(b). If the election for death by

electrocution is not made within 30 days, the option is waived. *Id.* The statute contains no definition or required method of "lethal injection."

43. Alabama's current lethal injection protocol is not publicly available, and the Attorney General has refused to disclose, even confidentially, the venous protocol to Mr. Hamm's counsel. As a result, the venous protocol is simply unknown. Alabama has used consistently since September 2014, and most recently, the intravenous administration of: (1) 500 milligrams of midazolam hydrochloride, (2) 100 milligrams of rocuronium bromide, and (3) 240 milliequivalents of potassium chloride. *See, e.g., Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1274 (11th Cir. 2016).

44. Due to the secrecy surrounding Alabama's lethal injection protocol, it is not clear how the Department of Corrections handles executions in which the prisoner's veins are severely compromised and conventional peripheral access is not possible. Despite repeated attempts, undersigned counsel has not been provided any information from the Attorney General about the Alabama protocol for venous access. Counsel renewed his request for the protocol for venous access by letter dated Monday, September 11, 2017, but has received no response.

45. Based on factual situations in similar recent cases, as well as conversations with Dr. Heath, undersigned counsel understands that the only realistic option that ADOC will consider as an alternative to peripheral access is percutaneous central venous access.

46. In the past, ADOC has proposed another technique: a "cut-down" procedure to access peripheral veins. This procedure is a surgical venous technique that requires a doctor to make an incision in a patient's arms or legs to expose a peripheral vein into which a cannula is inserted. The procedure has been described as a "dangerous and antiquated medical procedure to be performed only be a trained physician in a clinical environment with the patient under deep sedation. In light of safer and less-invasive contemporary means of venous access…'there is no comprehensible reason

for the State of Alabama to be planning to employ the cut-down procedure.'" *Nelson v. Campbell*, 541 U.S. 637, 642 (2004). In *Nelson,* the State itself recognized how risky and complicated the cut-down procedure was, ultimately deciding against the technique and instead proposing central venous access. Due to the recognized dangers of the cut-down technique, it is therefore highly unlikely that ADOC will attempt such a procedure.

47. The most likely, and only potentially feasible, alternative for venous access in this case is percutaneous central venous access, as the Georgia Department of Corrections has done. Central venous cannulation is "a technique for gaining access to one of the major veins in an individual's body." *Gissendaner v. Comm'r, Georgia Dept' of Corr*. (*Gissendaner I*), 779 F.3d 1275, 1278 n.4 (11th Cir. 2015). This technique is most commonly attempted on one of three central veins: the internal jugular vein in the neck, the femoral vein in the groin, or the subclavian vein near the clavicle. Each of these veins is located near the largest groupings of lymph nodes in the human body.

48. In Mr. Hamm's case, percutaneous central venous access is likely to be extremely dangerous. Finding a central vein is difficult and typically requires ultrasound equipment to reliably locate the correct vein. If done incorrectly or imprecisely, the technique risks puncturing arteries, which could lead to a bloody and painful death before the drugs are even administered. The procedure requires a level of medical training and experience that ADOC is, in all likelihood, unable to provide.

49. Percutaneous central venous access is also highly dangerous for Mr. Hamm in particular because of his serious lymphatic cancer, which has caused Mr. Hamm's lymph nodes to unpredictably swell. According to Dr. Heath, "If there are enlarged lymph nodes surrounding the veins in his neck, chest, or groin, it would likely complicate or thwart attempts to obtain central venous access." Preliminary Report of Mark. J. S. Heath, M.D., ¶14. Establishing central venous

access is difficult and should be performed by a physician, particularly in cases in which the inmate, like Mr. Hamm, has several other medical complications, as comprehensively detailed above.

## CAUSE OF ACTION

### I. The State's Proposed Use of Lethal Intravenous Injection to Execute Mr. Hamm Creates a Substantial Risk that Mr. Hamm Will Experience Severe Pain and Suffering in Violation of the Eighth Amendment to the United States Constitution.

50. The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." It is well established that, to be constitutional, a punishment must not be "incompatible with the evolving standards of decency that mark the progress of a maturing society" and may not "involve unnecessary or wanton infliction of pain." *Estelle v. Gamble*, 492 U.S. 97, 102 (1976); *see also In re Kemler*, 136 U.S. 436, 447 (1890) ("[P]unishments are cruel when they involve torture or a lingering death.").

51. To establish that a future harm will violate the Eighth Amendment, "the conditions presenting the risk must be '*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'" *Baze*, 553 U.S. at 50 (citing *Helling v. McKinney*, 509 U.S. 25, 33, 34-35 (1993)). In the context of lethal injection, "there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm,' that prevents prison officials from pleading that they were 'subjectively blameless for the purposes of the Eighth Amendment.'" *Id.* at 1531 (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

52. In addition to showing a "substantial risk of serious harm," an inmate challenging a method of execution must also identify an alternative method that is "feasible, readily implemented, and [will] in fact significantly reduce a substantial risk of severe pain." *Id.* at 1532. If an inmate offers an alternative that meets the *Baze* criteria and "a State refuses to adopt such an alternative in

the face of these documented advantages, without a legitimate penological justification for adhering to its current method of execution, then a State's refusal to change its method can be viewed as 'cruel and unusual' under the Eighth Amendment." *Id.*[2]

53. Mr. Hamm can make both of these showings.

### A. The State's Use of Intravenous Lethal Injection to Execute Mr. Hamm is Sure or Very Likely to Result in the Experience of Severe Pain and Suffering.

54. There is a "substantial" and "objectively intolerable" risk that Mr. Hamm will experience severe pain and suffering if Alabama proceeds to execute him by intravenous lethal injection, in violation of his Eighth Amendment rights. Mr. Hamm's serious and worsening cancer, compounded with his extensive prior medical history and compromised veins, create a considerable likelihood of unnecessary and excruciating pain during the administration of a lethal injection.

55. Because Mr. Hamm has severely compromised veins, it will be exceedingly difficult, if not impossible, for prison personnel to establish reliable peripheral intravenous access during the lethal injection procedure. If ADOC attempts to access Mr. Hamm's peripheral veins anyway, they will very likely be unsuccessful and will, in the process, cause pain to Mr. Hamm by repeatedly attempting to insert needles into inaccessible veins.

56. ADOC will instead attempt to establish percutaneous central venous access. As described above, this technique is much more difficult and requires a much higher level of training than is required for conventional peripheral intravenous access. In addition to the general risks that the technique poses, the procedure presents specific problems for Mr. Hamm, given his unique medical

[2] Notably, this decision does not impose any requirement that the proffered alternative be allowed by statute. In fact, this language implies the exact opposite. *See Arthur v. Dunn, Comm'r, Alabama Dep't of Corr.*, 137 S.Ct. 725, 729 (2017) (Sotomayor, J., dissenting from denial of certiorari) ("The decision below turns this language [of *Baze*] on its head, holding that if the State *refuses* to adopt the alternative legislatively, the inquiry ends. That is an alarming misreading of *Baze*.").

condition. As Dr. Heath concluded after examining Mr. Hamm, "there may be significant involvement and enlargement of lymph nodes in other areas of [Mr. Hamm's] body, including his neck, chest, and groin. If there are enlarged lymph nodes surrounding the veins in his neck, chest, or groin, it would likely complicate or thwart attempts to obtain central venous access." *See* Preliminary Report of Mark. J. S. Heath, M.D., ¶14. As such, central venous access for Mr. Hamm is likely to be extremely difficult, dangerous, and bloody because of the combination of Mr. Hamm's lymphatic cancer and the lack of a fully equipped hospital operation-room set up at Holman Prison.

57. There is clear evidence that Mr. Hamm will almost certainly be subjected to an unconstitutional amount of pain and suffering. This risk is objectively intolerable and cannot be countenanced by the Eighth Amendment, particularly when there exist readily available and more humane alternatives.

### B. An Oral Injection of a Lethal Drug Is a Feasible, Readily Implemented Alternative that Would Eliminate the Substantial Risk of Severe Pain Arising from Mr. Hamm's Unique Medical Conditions

58. As an alternative method of execution, Mr. Hamm proposes a ten-gram dose of secobarbital injected orally in four ounces of liquid; alternatively, Mr. Hamm proposes a drug cocktail known to doctors as "DDMP II," which is composed of 1 gram of diazepam, 50 milligrams of digoxin, 15 grams of morphine sulfate, and 2 grams of propranolol, injected orally. These oral forms of lethal injection are both "feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain" associated with intravenous administration of the lethal injection in Mr. Hamm's case. *Baze*, 553 U.S. at 50. These alternative methods of execution are recommended by Dr. Charles David Blanke, an experienced physician who specializes in end-of-life care, specifically in medical-aid-in-dying (MAID). *See* Affidavit of Dr. Charles David Blanke, attached as Appendix C, ¶ 5, 6, 11.

59. Alabama law does not specify the method of lethal injection that the State is authorized to use and does not limit the mode of execution to solely intravenous injection. The statute states only that "[a] death sentence shall be executed by lethal injection." Ala. Code § 15-18-82.1(a). The definition of "injection" is not confined to only intravenous injections. The Oxford English Dictionary defines "injection" as "[t]he action of forcing a fluid, etc. into a passage or cavity, as by means of a syringe, or by some impulsive force." An oral form of lethal injection is therefore authorized by Alabama statute and fulfills the Eleventh Circuit's requirement that the alternative method of execution be permitted by state law. *Arthur v. Comm'r, Alabama Dep't of Corr.*, 840 F.3d 1268 (11th Cir. 2016). In contrast to other states that explicitly narrow the term injection to venous injection, the Alabama statute clearly allows for other forms of injection, such as oral injection.[3]

**Feasible and Readily Implemented**

60. An oral dose of a lethal drug or drug cocktail is feasible and readily implemented. In his affidavit, Dr. Blanke explains that the standard MAID medication used in Oregon is secobarbital or the drug cocktail DDMP II. *See* Affidavit of Dr. Charles David Blank at ¶ 3. MAID was legalized in Oregon in 1997 through Oregon's Death with Dignity Act (DWDA). The DWDA "allows terminally-ill adult Oregonians to obtain and use prescriptions from their physicians for self-administered, lethal doses of medications." *See Death With Dignity Act Annual Reports.*[4] As a result, Oregon physicians have extensive experience using lethal drugs for end-of-life decisions.

61. Since MAID was legalized in Oregon in 1997, and as of January 23, 2017, 1,127 people

---

[3] *See, e.g.,* Ark. Code Ann. § 5-4-617 ("The Department of Correction shall carry out the sentence of death by *intravenous* lethal injection") (emphasis added); Neb. Rev. Stat. § 83-964 ("A sentence of death shall be enforced by the *intravenous* injection of a substance.") (emphasis added); Utah Code Ann. § 77-18-5.5 ("[L]ethal *intravenous* injection is the method of execution") (emphasis added).

[4] Oregon Health Authority, *Death with Dignity Act Annual Reports* 4 (2017), http://www.oregon.gov/oha/PH/PROVIDERPARTNERRESOURCES/EVALUATIONRESEARCH/DEATHWITHDIGNITYACT/Documents/year19.pdf.

had died after taking lethal medications prescribed under the DWDA. *See id*. at 5. Of the 1,127 people who died from taking lethal prescriptions between 1997 and January 23, 2017, 668 or 59.3% were prescribed secobarbital, while 17, or 1.5%, were prescribed a combination of lethal medications; and of the 133 people who died from taking lethal prescriptions in 2016, 86 or 64.7% were prescribed secobarbital, while 8, or 6%, were prescribed a combination of lethal medications. *See id.* at 10.

62. Of the 133 people who died from taking lethal prescriptions in 2016, the median range of minutes between ingestion and unconsciousness was 4 minutes; of the 1,127 people who died from taking lethal prescriptions between 1997 and January 23, 2017, the median range of minutes between ingestion and unconsciousness was 5 minutes. *See id.* at 11. Of the 133 people who died from taking lethal prescriptions in 2016, the median range of minutes between ingestion and death was 27 minutes; of the 1,127 people who died from taking lethal prescriptions between 1997 and January 23, 2017, the median range of minutes between ingestion and unconsciousness was 25 minutes. *See id.* at 11; *see also Guidelines for the Practice of Euthanasia and Physician-Assisted Suicide* (for details on exact procedures and protocols to ensure successful and painless death by medical-aid-in-dying medications)[5]; *The Oregon Death with Dignity Act: A Guidebook for Health Care Professionals* (for more information on how MAID medications are made available by pharmacies and prescribed by physicians in Oregon).[6]

63. An oral injection of lethal drugs would require less medical expertise, equipment, and risk on the part of ADOC personnel, making it much more feasible than an intravenous injection.

[5] KNMG/KNMP, *Guidelines for the Practice of Euthanasia and Physician-Assisted Suicide* (Aug. 2012), http://www.camapcanada.ca/NetherlandsGuidelines.pdf.

[6] Task Force to Improve the Care of Terminally-Ill Oregonians et al., *The Oregon Death with Dignity Act: A Guidebook for Health Care Professionals* (2008), http://www.ohsu.edu/xd/education/continuing-education/center-for-ethics/ethics-outreach/upload/Oregon-Death-with-Dignity-Act-Guidebook.pdf.

64. These drugs are also available to the ADOC, so the defendants will have no difficulty accessing these drugs for Mr. Hamm's execution. These drugs are available at pharmacies and are not among the drugs that are restricted from sale to prisons by pharmaceutical companies. In particular, secobarbital is a common barbiturate drug that is that is frequently used as a sedative prior to surgery. *See Encyclopedia of Psychopharmacology*.[7] Moreover, all of the components of Mr. Hamm's second alternative proposed method, the DDMP II cocktail, are available in pharmacies in Alabama. All of the components of the DDMP II cocktail are also covered by the Alabama Blue Cross Blue Shield insurance policy.[8] *See* Doc. 14, Ex.W.

65. In fact, these proposed drugs are likely more easily accessible to ADOC than midazolam, one of the current drugs used in the state's execution protocol. As an exhibit to their motion for summary judgment, the defendants revealed that they intend to use midazolam manufactured by Akorn, Inc. However, Akorn's policy clearly states that their products are not intended for use in lethal injections. *See Akorn Adopts Comprehensive Policy to Support the Use of Its Products to Promote Health.*[9]

66. In 2015, Akorn, Inc. put into a place a policy that condemned the use of its products in lethal injections. The policy restricted the sale of their drugs to wholesalers who would not supply their drugs to prisons:

> Akorn strongly objects to the use of its products to conduct or support capital punishment through lethal injection or other means. To prevent the use of our products in capital punishment, Akorn will not sell any product directly to any prison or other

[7] Childs, E. (2010) Secobarbital *in* Stolerman (ed.), *Encyclopedia of Psychopharmacology* at 1187.

[8] Blue Cross and Blue Shield of Alabama, *Generics Plus Drug Guide* (Oct. 2017), https://www.myprime.com/content/dam/prime/memberportal/forms/2017/FullyQualified/Other/ALL/BCBSAL/COMMERCIAL/ALGENPLDRG/ALGP_Prescription_Drug_Guide.pdf; diazepam on p. 34, digoxin on p. 26, morphine sulfate on p. 43, and propranolol on p. 22.

[9] *Akorn Adopts Comprehensive Policy to Support the Use of its Products to Promote Health*, http://investors.akorn.com/phoenix.zhtml?c=78132&p=irol-newsArticle&ID=2022522.

> correctional institution and we will restrict the sale of known components of lethal injection protocols to a select group of wholesalers who agree to use their best efforts to keep these products out of correctional institutions.

*Id.*

67. Akorn also sent letters "to the attorneys general and heads of departments of correction of the states that currently execute inmates or have prisoners on death row along with the United States Attorney General, the United States Secretary of Defense, the Director of the Federal Bureau of Prisons and the Chairman of the Department of Defense Corrections Council reiterating the company's policy on the appropriate use of its products." In addition, Akorn stated it "is seeking the return of any the company's products that may have been inappropriately purchased to aid in the execution process." *Id.; see also Drug-Maker Akorn Bans Sedative Midazolam For Executions.*[10]

68. The Akorn midazolam label that the defendants provided as Exhibit H also states clearly that "Intravenous midazolam should be used only in hospital or ambulatory care settings, including physicians' and dental offices, that provide for continuous monitoring of respiratory and cardiac function." *See* Doc. 12 Ex. H p. 1. From this, it is clear that the defendants do not actually follow the FDA's approved uses of midazolam and obtain and use drugs as they wish.

69. In 2016, Anne Hill, a lawyer for the Department of Corrections, stated in a deposition that Alabama last bought midazolam in 2015. *See Alabama's Execution Drugs May Be Close to Expiring.*[11] Since 2015, Akorn's policies prohibit its drugs to be sold to entities that would use the drugs or sell the drugs for use in lethal injections and the shelf life of midazolam is 24 months. *See*

[10] NBC News, *Drug-Maker Akorn Bans Sedative Midazolam For Executions* (Feb. 20, 2015), https://www.nbcnews.com/storyline/lethal-injection/drug-maker-akorn-bans-sedative-midazolam-executions-n309191.

[11] The Anniston Star, *Alabama's Execution Drugs May Be Close to Expiring*, (June 24, 2017), https://www.annistonstar.com/free/alabama-s-execution-drugs-may-be-close-to-expiring/article_db530a64-5920-11e7-9999-8ba8c52a886b.html.

*Public Assessment Report of the Medicines Evaluation Board in the Netherlands.*[12] Therefore any drugs that ADOC bought prior to 2015 have since expired. Clearly, then, the state of Alabama has been able to access midazolam, despite nearly every pharmaceutical company banning the use of their products in lethal injections.[13] There is no doubt that the defendants have ways to obtain the drugs they use in their lethal injection protocol, and will similarly be able to obtain secobarbital or the components of the DDMP cocktail.

**Significantly Reduce the Risk of Serious Harm**

70. An oral dose of a lethal drug or drug cocktail will significantly reduce the risk of serious harm to Mr. Hamm.

71. The method used in Oregon and recommended by Dr. Blanke reduces the risk of serious harm—namely a botched execution—from 7.12% to about 0.6% for generally healthy prisoners. *See infra.* Most botched executions are unsuccessful due to difficulty finding veins and errors on the part of the execution staff. In fact, lethal injection has the highest rate of botched executions among all methods of execution (including hanging, electrocution, lethal gas, and firing squad). *See Death Penalty Information Center*[14]; *How Often Are Executions Botched?*[15]A reduction from a 7.12% chance of a botched execution to a 0.6% chance is a significant reduction in risk. In Mr. Hamm's

---

[12] *Public Assessment Report of the Medicines Evaluation Board in the Netherlands* 4, https://db.cbg-meb.nl/Pars/h100485.pdf.
[13] *See, e.g.,* Pfizer, *Pfizer's Position on Use of Our Products in Lethal Injections for Capital Punishment* (Sept. 2017), https://www.pfizer.com/files/b2b/Global_Policy_Paper_Lethal_Injection_Sept_2017.pdf; *see also* Reprieve, *Industry Statements and Action on Execution Drugs* (Feb. 9, 2017), http://reprieve.org/2017/02/09/industry-statements-and-action-on-execution-drugs/ for a full list of policy statements by pharmaceutical companies banning the use of their drugs in lethal injections.
[14] Death Penalty Information Center, *Botched Executions*, https://deathpenaltyinfo.org/some-examples-post-furman-botched-executions (citing Austin Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty*, Stanford Univ. Press (2014)).
[15] Mona Chalabi, *How Often Are Executions Botched?*, FiveThirtyEight (Apr. 30, 2014), https://fivethirtyeight.com/features/how-often-are-executions-botched/.

case, the risk is even more dramatically reduced because the possibility of a botched execution by intravenous lethal injection in his case is nearly certain. Thus, an oral dose of lethal drugs reduces the risk of a botched execution in Mr. Hamm's case from nearly 100% to 0.6%.

72. The Royal Dutch Pharmaceutical Association (KNMP) issued a guide to physicians in 1987, revised in 1994 and then again in 1998, which included their recommendation for the drugs that physicians should prescribe, and the protocols that they should follow when prescribing MAID medications. *See Clinical Problems with the Performance of Euthanasia and Physician-Assisted Suicide in The Netherlands*.[16] In the guide, they recommend that physicians prescribe 9 grams of secobarbital or pentobarbital in a 100-milliliter solution. This method has been shown to "cause a comatose state, followed by a decrease of cardiac output and finally a respiratory arrest." *Id.* at 80.

73. In August 2012, the KNMP and the Royal Dutch Medical Association (KNMG) released an updated guide. *See Guidelines for the Practice of Euthanasia and Physician-Assisted Suicide*.[17] In the case of medical-aid-in-dying, the KNMP/KNMG recommends that the physician prescribe 15 grams of a barbiturate (pentobarbital or secobarbital) in the form of a drink (mixture of non-therapeutics). *Id.* at 17. The guide describes the exact mixture to be used, advising the use of either secobarbital or pentobarbital in addition to alcohol, purified water, propylene glycol, saccharin sodium, syrup simplex, and star anise oil. *See id*. at 41. It also describes the preparation and gives directions for proper storage of the mixture. The patient is advised to take the lethal cocktail orally, and to be sitting up and be in a bed when he or she takes the cocktail. *See id.* at 17.

74. The use of medical-aid-in-dying medications would result in a significantly lower risk of severe pain than the state of Alabama's present lethal-injection protocol. In Oregon, for example, an

[16] Groenewoud JH, et al., *Clinical Problems with the Performance of Euthanasia and Physician-Assisted Suicide in The Netherlands*, New England Journal of Medicine, 551-666 (2000).
[17] KNMG/KNMP, Guidelines for the Practice of Euthanasia and Physician-Assisted Suicide 17 (Aug. 2012), http://www.camapcanada.ca/NetherlandsGuidelines.pdf.

analysis of the drug effectiveness and complications of patients who had ingested MAID medications since 1998 showed that "[t]he medications were relatively devoid of unexpected toxic effects. Vomiting was unusual (24 patients, 2.4%). Six patients awakened, giving the medications an efficacy rate of 99.4%." *See Characterizing 18 Years of the Death With Dignity Act in Oregon*[18]; *see also Oregon's Death With Dignity Act: 20 Years of Experience to Inform the Debate*.[19] This stands in stark contrast to the 7.12% rate at which lethal injections are botched generally and the nearly certain risk of a botched execution in Mr. Hamm's case. Moreover, inefficacy in the MAID context does not result in mutilation and excessive pain as in the case of a botched intravenous lethal injection.

75. Reducing the risk of a botched execution not only protects Mr. Hamm from experiencing excruciating pain but also shields ADOC staff from the risk of Hepatitis C transmission in the event of a bloody execution.

**II. The Defendants' Actions During Mr. Hamm's Detainment on Death Row Amount to Cruel and Unusual Punishment in Violation of the Eighth Amendment.**

76. In effect, the combination of the following five factors renders the planned execution of Mr. Hamm by intravenous lethal injection violative of the Eighth Amendment: (1) first, that Mr. Hamm has been on death row awaiting execution now for over thirty years; (2) second, that the state intends to execute him despite the fact that he has been battling cancer since at least February 2014 and despite the fact that he does not have long to live; (3) third, that the state has not been properly treating his cancer and as a result that he is suffering pain from his untreated cancer; (4) fourth, that the state is persisting in moving forward with an intravenous lethal injection that will be excessively

---

[18] C. Blanke, et al., *Characterizing 18 Years of the Death with Dignity Act in Oregon*, JAMA Oncol. 1403-06 (2017).
[19] K. Hedberg, et al., *Oregon's Death with Dignity Act: 20 Years of Experience to Inform the Debate*, Ann. Intern Med. 2 (2017).

painful and cause unnecessary suffering because he does not have readily accessible veins for the catheter that would be needed to introduce the lethal drugs into his veins; and now, (5) fifth, that the state is trying to prick him with needles all the time, in a manner that constantly reminds him of his looming painful intravenous lethal injection. The combination of all these five elements constitute a "great increase" of Mr. Hamm's punishment—his sentence of death—in violation of his Eighth Amendment rights. *In re Medley*, 134 U.S. 160, 172 (1890).

77. The Eighth Amendment prohibits "cruel and unusual punishments" and "the imposition of inherently barbaric punishments under all circumstances." *Graham v. Florida*, 560 U.S. 48, 58-59 (2010). The Eighth Amendment forbids punishments that are "totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Gregg v. Georgia*, 428 U.S. 153, 183 (1976)) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Accordingly, "punishments of torture . . . and all others in the same line of unnecessary cruelty . . . are forbidden." *Wilkerson v. State of Utah*, 99 U.S. 130, 136 (1878); *see also Graham*, 560 U.S. at 58 ("[P]unishments of torture, for example, are forbidden."). In addition, the Eighth Amendment "proscribes more than physically barbarous punishments." *Gamble*, 429 U.S. at 102. It also outlaws punishments that "involve the unnecessary and wanton infliction of pain," *Gregg*, 428 U.S. at 173 (1976).

78. The Eighth Amendment therefore forbids both subjecting a person to "circumstance[s] of degradation," *Weems v. United States*, 217 U.S. 349, 366 (1910), and "circumstances of terror, pain, or disgrace superadded" to a sentence of death, *id.* at 370. As Justice Blackmun has articulated:

> As the Court makes clear, the Eighth Amendment prohibits the unnecessary and wanton infliction of "pain," rather than "injury." "Pain" in its ordinary meaning surely includes a notion of psychological harm. . . . . I have no doubt that to read a "physical pain" or "physical injury" requirement into the Eighth Amendment would be . . . pernicious and without foundation . . . .

*Hudson v. McMillan*, 503 U.S. 1, 16-17 (1992) (Blackmun, J., concurring) (citations omitted).

79. Accordingly, "[t]here may be involved no physical mistreatment, no primitive torture," and a "fate of ever-increasing fear and distress" offends the Eighth Amendment. *Trop v. Dulles*, 356 U.S. 86, 101-102 (1958) (condemning punitive denationalization); *see also Hudson v. McMillian*, 503 U.S. 1, 26 (1992) ("That is not to say that the injury [violating the Eighth Amendment] must be, or always will be, physical.") (Thomas, J., dissenting); *Weems*, 217 U.S. at 372 ("[I]t must have come to [framers of the Eighth Amendment] that there could be exercises of cruelty by laws other than those which inflicted bodily pain or mutilation.").

80. The combined effect of defendants' five actions listed above constitute a punishment far worse than that to which Mr. Hamm was sentenced. Each factor adds to Mr. Hamm's torturous experience and, combined altogether, they amount to cruel and unusual punishment in violation of the Eighth Amendment.

**A. Confining Mr. Hamm to Death Row for Over Thirty Years**

81. The Supreme Court has long held that punishments are unconstitutionally cruel and unusual "when they involve torture or a lingering death." *In re Kemmler*, 136 U.S. 436, 477 (1890). An excessively prolonged period of time between sentencing and execution is undoubtedly a form of torture or lingering death, causing a host of physical and emotional ills. Indeed, the Court has rightly noted that "when a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it." *In re Medley*, 134 U.S. at 172 (1890) (case involving a delay of merely four weeks between sentencing and execution). Justices Stevens and Breyer have consistently urged that an excessive length of confinement is cruel and unusual. *See Knight v. Florida*, 120 S.Ct. 459, 462 (1999) (Breyer, J., dissenting from denial of certiorari) ("It is difficult to deny the suffering inherent in a prolonged wait for execution – a matter which courts and individual

judges have long recognized."); *Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., memo respecting denial of certiorari); *Foster v. Florida*, 537 U.S. 990 (2202) (Breyer, J., dissenting from denial of certiorari); *Elledge v. Florida*, 525 U.S. 944 (1998) (Breyer, J., dissenting from denial of certiorari).

82. Defendants have confined Mr. Hamm to death row for over thirty years, causing him to languish in degrading conditions, always with the threat of execution looming over him. Such a prolonged length of confinement has inflicted significant physical, emotional, and mental anguish on Mr. Hamm, severely exacerbating the punishment to which Mr. Hamm has been subjected over the past thirty years.

83. As of 2013, the average elapsed time from sentence to execution for prisoners sentenced to death in the United States was 186 months, or fifteen-and-a-half years.[20] Mr. Hamm has been suffering on death row for twice this amount of time.

84. Mr. Hamm bears no responsibility for this delay as he has simply pursued his ordinary appeals and post-conviction remedy.

85. A delay of over thirty years has subjected Mr. Hamm to particularly degrading and severe conditions of confinement. In Justice Stevens's words, the conditions on death row are "especially severe [and] dehumanizing." *Johnson v. Bredesen*, 130 S. Ct. 541, 543 (Stevens, J., memo respecting denial of certiorari); *see also Thompson v. McNeil*, 129 S.Ct. 1299, 1299 (Stevens, J., memo respecting denial of certiorari) (describing the "especially severe" conditions of death row and observing that the "dehumanizing effects of such treatment are undeniable").

86. At Donaldson Correctional Facility, where Mr. Hamm has been confined for the past thirty years, the conditions have been especially severe. Last year, the Middle District of Alabama

[20] *See* U.S. DOJ, *Capital Punishment, 2013 – Statistical Tables* tbl.10 (Dec. 19, 2014), https://www.bjs.gov/content/pub/pdf/cp13st.pdf.

found ADOC facilities, including Donaldson, to be woefully inadequate in failing to provide adequate medical care to inmates. *See Braggs v. Dunn*, 257 F. Supp. 3d 1171 (M.D. Ala. 2017). Furthermore, at Donaldson specifically, more inmates have died of disease and suicide than by execution.[21] These statistics suggest the particular physical and emotional consequences of living on death row at Donaldson Correctional Facility and Mr. Hamm has undoubtedly been affected by ADOC's failure to take care of prisoners, as evidenced by his deteriorating physical condition.

87. This excessively long period between sentencing and execution, when combined with the other four factors listed herein, amounts to cruel and unusual punishment in violation of the Eighth Amendment.

**B. Pursuing Execution Despite Mr. Hamm's Cancer and Deteriorating Health**

88. As Mr. Hamm has awaited his execution for over thirty years, his health has progressively deteriorated, becoming particularly painful and life threatening within the past few months.

89. Despite knowledge of Mr. Hamm's deteriorating condition and worsening cancer, defendants have pursued the execution of a man who will likely soon die of his cancer.

90. Defendants undoubtedly have knowledge of Mr. Hamm's deteriorating health. There are hundreds of pages of medical records detailing his pain and suffering, and the physical manifestations of his cancer—including inflamed lymph nodes in his neck and chest and a growing lesion on his face that has been eating into his cheek—are immediately obvious to anyone who sees him.

91. Pursuing Mr. Hamm's execution despite his clearly deteriorating condition amounts to

---

[21] See AP, *More Alabama Death Row Inmates Die from Disease, Suicide than Execution*, AL.com (Nov. 27, 2015), http://www.al.com/news/index.ssf/2015/08/alabama_death_row_inmates_more.html.

cruel and unusual punishment in violation of the Eighth Amendment. As a result of the defendants' inhumane decision to pursue execution, Mr. Hamm is not only suffering through a painful and debilitating cancer but is now also burdened by the fear of an impending execution. This torturous experience, when combined with the other four factors contained herein, amounts to cruel and unusual punishment in violation of the Eighth Amendment.

**C. Failing to Treat Mr. Hamm's Cancer**

92. It is well established that "deliberate indifference to serious medical needs of prisoners" constitutes "unnecessary and wanton infliction of pain" in violation of the Eighth Amendment to the Constitution. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Eleventh Circuit has held that a "core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." *McElligot v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).

93. To establish that the defendants have acted with deliberate indifference to serious medical needs, Mr. Hamm makes two showings: (1) he has an "objectively serious medical need," and (2) "the prison official[s] acted with deliberate indifference to that need." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004).

94. First, Mr. Hamm has an objectively serious medical need—namely, his cancer. Mr. Hamm's cancer has both been diagnosed by a physician as mandating treatment and is so obvious that a layperson would recognize the need for a doctor's treatment. There should be no debate that Mr. Hamm's condition is "objectively serious." *Id.*

95. Second, defendants have acted with deliberate indifference to Mr. Hamm's cancer. Deliberate indifference must be proven by showing that the defendants: (1) had subjective

knowledge of a risk of serious harm; (2) disregarded that risk; (3) by conduct that is more than mere negligence. *McElligot v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Conduct that is "more than mere negligence" includes: (1) knowledge of a serious medical need and a failure or refusal to provide care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care; (4) a decision t take an easier but less efficacious course of treatment; or (5) medical care that is so cursory as to amount to no treatment at all. *Magwood v. Sec., Fla. Dep't of Corrs*, 652 Fed.Appx. 841, 844 (11th Cir. 2016).

96. With knowledge of Mr. Hamm's serious medical condition, defendants have repeatedly failed to provide care, exhibiting deliberate indifference to Mr. Hamm's needs.

97. Mr. Hamm has never received any treatment beyond the radiation for the cancerous mass behind his left eye and in his skull. In other words, defendants have never treated any of his other lymphatic cancer condition.

98. Moreover, the medical records indicate that Mr. Hamm has had a cancerous lesion under his left eye since February 2014, and that, although his doctors have recommended that he receive surgery for that lesion since February 2014, he has remained untreated. The cancerous lesion was biopsied in February 2014, April 2017, and November 2017 and found to be cancerous. *See* Doc. 14, Ex. X (medical records obtained from Dr. John P. Donahue). Each time, the pathology report indicated cancer. Each time, Mr. Hamm was recommended for surgery. To date, he has still not been operated on.

99. On December 13, 2017, Mr. Hamm was scheduled to go out for surgery for his lesion on his cheek, but instead the warden at Donaldson Correctional Facility, Leon Bolling, cancelled the medical visit in order to read Mr. Hamm his death warrant.

100. Defendants' repeated and inexcusable failure to provide adequate care to Mr. Hamm

despite knowledge of his deteriorating health, when combined with the other four factors contained herein, amounts to cruel and unusual punishment in violation of the Eighth Amendment.

### D. Pursuing an Execution by Intravenous Lethal Injection Despite Mr. Hamm's Severely Compromised Veins

101. Mr. Hamm's looming execution is worsened by the method that the state is attempting to pursue. The prospect of being led to the execution chamber to undergo a botched execution as the executioners try unsuccessfully to access his veins, pricking him all over his limbs, or worse, inserting a catheter into his muscle rather than his veins, resulting in excruciating pain and suffering, is a terrifying prospect.

102. The mental anguish that the state's chosen method of execution is inflicting upon Mr. Hamm, combined with the other four factors listed herein, amounts to cruel and unusual punishment in violation of the Eighth Amendment.

### E. Attempting to Insert Needles and Draw Blood from Mr. Hamm's Severely Compromised Veins

103. As detailed above, since about October 2017, defendants have engaged in a practice of constantly trying to prick Mr. Hamm with needles under the pretext of drawing blood.

104. The attempts to draw blood have, and will continue to, inflict physical pain upon Mr. Hamm. This is especially true because Mr. Hamm's veins are severely compromised, so accessing his veins is difficult and typically requires more than one attempt.

105. Repeatedly attempting to establish venous access will also subject Mr. Hamm to emotional and mental torture, reminding him of his impending execution. The difficulty that prison staff have had, and will continue to have, in accessing his veins reminds Mr. Hamm that his execution has a high risk of being botched and causing him severe pain.

106. The physical and mental anguish caused by defendants' constant and unnecessary

pricking of Mr. Hamm with needles, combined with the effect of the other four factors listed herein, constitutes cruel and unusual punishment in violation of the Eighth Amendment.

107. Inasmuch as the Supreme Court's analyses of cruel and unusual punishment have repeatedly endorsed a cumulative approach—an accumulation of the excessively painful and degrading elements—there is strong doctrinal support for this legal claim. *Weems*'s focus on the "accessories" in its "graphic description of Weems's sentence" is instructive, as is its language about "circumstance[s] of degradation" and its suggestion that a prototypical case of cruel and unusual punishment would be presented if "circumstances of terror, pain, or disgrace" were "superadded" to a "sentence of death." *Weems*, 217 U.S. at 366, 370. The Supreme Court also emphasized in *Medley* the same *accessories* theme—namely, that seclusion in solitary confinement and a prohibition against telling a condemned prisoner the date and time of his execution are increased punishments, in violation of the *ex post facto* clause, because seclusion induces "further terror," while "secrecy [about the time of execution] must be accompanied by an immense mental anxiety amounting to a great increase in punishment." *In re Medley*, 134 U.S. at 172. In addition, in *Trop*, the Supreme Court held that a punishment entailing a "fate of ever-increasing fear and distress" offends the Eighth Amendment. *Trop,* 356 U.S. at 101. It is also clear that the Eighth Amendment precludes deliberate indifference to a prisoner's medical condition. *See Gamble*, 429 U.S. at 104 ("We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment.").

108. It is important here to emphasize the psychological and traumatic aspect of Mr. Hamm's situation. It might be worth considering how we each would feel if we were being periodically needle-probed to prepare and remind us of a looming intravenous lethal injection. Mr. Hamm's

psychological plight must be understood against the background of the social science evidence suggesting how people cope with the prospect of various kinds of approaching deaths. What this evidence and these studies show is that Alabama's repeated probing to try out whether it can find a vein when the time comes is about as torturous a run-up to death as a government could conceivably devise.

109. Psychological science seconds the commonsense human intuition that the anticipation of pain can exacerbate the suffering of pain;[22] and that "dread increases exponentially as pain is approached in time."[23] Psychological understanding of the mechanisms people use to cope with the anticipation of death from illness is instructive with respect to the experience of persons waiting to be executed by the state.[24] It teaches us that condemned inmates like Mr. Hamm will attempt to prepare psychologically for their executions. They will attempt to make sense of their impending deaths; they will spend time contemplating what is about to happen, harnessing whatever psychological and emotional resources they have available to withstand the fate they know awaits

[22] A. Ploughaus et al., *Dissociating Pain from its Anticipation in the Human Brain*, 284 Science 1979 (1999). As one researcher has noted: "Even the suffering associated with losses from past events [emphasizes its anticipatory nature]. . . because the suffering person is forced to anticipate the effects of the losses on his or her present and future." W. Fordyce, *Pain and Suffering: A Reappraisal*, 43 Amer. Psychologist 276, 278 (1988).

[23] G. Story et al., Dread and the Disvalue of Future Pain, 10 PLOS COMPUTATIONAL BIOLOGY 10 (2014). Regarding this research, George Loewenstein, a professor of economics and psychology at Carnegie-Mellon University, concluded: "This study demonstrates that the fear of anticipation is so strong it can reverse the usual pattern of time discounting . . . . It's probably not an exaggeration to say that as much, or more, of the pains of life come from anticipation and memory than from actual experience." *See* S. Makin, *Waiting for Pain Can Cause More Dread than Pain Itself*, New Scientist (2013), http://www.newscientist.com/article/dn24642-waiting-for-pain-can-cause-more-dread-than-pain-itself.html#.

[24] *See, e.g.,* E. Kubler-Ross, *On Death and Dying* (Macmillan 1969); E. Kubler-Ross, *The Languages of Dying Patients*, 10 Humanitas 5 (1974).

them. Like others for whom death is imminent,[25] condemned inmates experience anticipatory fear of dying, and this is an emotion that they struggle to overcome and manage.[26]

110. But Mr. Hamm faces more than simple pain and the loss of his life. He is now being pricked and prodded every two weeks to remind him of his impending execution. These aspects of the process by which they will die make their ability to cope with death overwhelmingly difficult—beyond the ordinary difficulty of facing death.

111. When one sits in a cell for thirty years with little to occupy one's thoughts except to ready oneself for death, the manner of one's dying comes to have a special place in one's imagination. The essence of Alabama's supplemental method of constant pricking, on top of his 30 years on death row, his cancer and non-treatment, and the prospect of a botched execution, is to deprive him of the capacity to hope that he can face what is to come with any solace of acceptance or redeeming courage.[27] Like raw physical pain, whose greatest horror is that it is mentally ungraspable, this agonizing pricking death is a prospect that cannot be made intelligible by the person who will suffer it. Demeaning and repulsive, gratuitously hideous, it defies assimilation in any of the ways through which the human mind and will can make destruction bearable—by explaining it, or alleviating it, or dignifying it, or otherwise putting it into a coherent frame of reference that allows something of worth and value and *sense* to coexist with death and to survive despite it.

---

[25] *See*, *e.g.*, J. Arndt et al., *Suppression, Accessibility of Death-Related Thoughts, and Cultural Worldview Defense: Exploring the Psychodynamics of Terror Management*, 73 J. of Personality and Social Psychology 5 (1997); T. Pyszczynski et al., *A Dual Process Model of Defense Against Conscious and Unconscious Death-Related Thoughts: An Extension of Terror Management Theory*, 106 Psych. Rev. 835 (1999).

[26] *See* C. Haney, *Psychological Secrecy and the Death Penalty: Observations on "The Mere Extinguishment of Life,"* 16 Studies in Law, Politics and Society 3 (1996).

[27] As Ernest Becker observed in his classic work: "We admire the courage to face death; we give such valor our highest and most constant adoration; it moves us deeply in our hearts because we have doubts about how brave we ourselves would be." E. Becker, *The Denial of Death* 11-12 (Free Press paperback ed. 1997)

112. Reliability or predictability is an important dimension of humane treatment. Knowledge about the nature of the process by which death will come has been found to assist what therapists have described as the "death anxiety"[28] or "terror management" that surrounds death by decreasing the profound fear that people associate with their impending demise.[29] Conversely, unpredictability and unreliability are hallmarks of cruel punishment. Introducing unpredictability into the process of administering pain is a favored practice of torturers who, by doing so, seek to intensify the fear their actions generate and the suffering it inflicts.[30] Thus, the unpredictability of events clearly adds to their painful quality.[31]

113. As the Supreme Court recognized more than a hundred years ago, uncertainty about the time of one's execution "must be accompanied by an immense mental anxiety amounting to a great increase in punishment." *In re Medley*, 134 U.S. 160, 171, 172 (1890). The constant remainder of that uncertainty through pricking and poking only aggravates the torture.

114. Physical mutilation is cited among the atrocities forbidden in the Supreme Court's early cases. *See, e.g., Weems v. United States*, 217 U.S.at 372 ("[T]here could be exercises of cruelty by

[28] R.A. Neimeyer & D. Van Brunt, Death Anxiety, *in* H. Wass, et al., *Dying: Facing the Facts* 49-88 (Taylor and Francis, 3d ed. 1995); R. Neimeyer, ed., *Death Anxiety Handbook: Research, Instrumentation, and Application* (Taylor and Francis 1994).

[29] C. Abengozar, B. Bueno & J. Vega, *Intervention on Attitudes toward Death along the Life Span*, 25 Educational Gerontology 435 (1999).

[30] *See, e.g.*, M. Basoglu & S. Mineka, "The Role of Uncontrollable and Unpredictable Stress in Post-traumatic Stress Responses in Torture Survivors," in *Torture and Its Consequences: Current Treatment Approaches* 182-225 (Cambridge University Press 1992); *see also* A. Koestler, *Darkness at Noon* (Macmillan 1941).

[31] *See e.g.*, T. Pyszczynski, J. Greenberg, & S. Solomon, "A Terror Management Perspective on the Psychology of Control: Controlling the Uncontrollable," in M. Kofta, G. Weary, *et al*., eds., *Personal Control in Action: Cognitive and Motivational Mechanisms* 85-108 (Plenum Press 1998); V. Florian & M. Mikulincer, *Fear of Death and the Judgment of Social Transgressions: A Multidimensional Test of Terror Management Theory*, 73 Journal of Personality and Social Psychology 369 (1997). Terror management is facilitated by the belief that future death-related events will be orderly and predictable. J. Lieberman, *Terror Management, Illusory Correlation, and Perceptions of Minority Groups*, 21 Basic and Applied Social Psychology 13 (1999).

laws other than those which inflicted bodily pain *or mutilation*."); *Wilkerson v. Utah*, 99 U.S. at 135 (citing drawing, beheading, quartering and public dissection as punishments forbidden by the Eighth Amendment). Indeed, some states and courts recognize that the guillotine, for instance, would violate the Eighth Amendment, even though probably instantaneous and painless, because of its disfiguring of the executed person. *See Provenzano v. Moore*, 744 So. 2d 413 (Fla. 1999). Yet here, Mr. Hamm, with his lymphoma, is being constantly reminded of the pricking and prodding and disfigurement he is going to experience.

115. Disfigurement and degradation are abhorred, moreover, because they represent ancient forms of power in which one's body was not one's own, but belonged to the sovereign to dispose of at his whim.[32] It was in part in reaction to this limitless power of the sovereign to trespass on an individual's right to his or her own bodily integrity that prohibitions against cruel and unusual punishment were erected. These prohibitions stand to limit not only government's power to inflict pain, but government's power to deform the very physical being of its citizens. That is why, among the "rules of government which . . . have [been] found to be essential to the preservation of those great principles of liberty and law . . . was that which prohibited the infliction of cruel and unusual punishment." *Weems*, 217 U.S. at 367-368.

116. In sum, the compounded punishment being administered on Mr. Hamm is a clear violation of Eighth Amendment. So practiced, it is a gratuitous affront to universal standards of contemporary decency and violates the Eighth Amendment. "A penalty . . . must accord with 'the dignity of man,' which is the 'basic concept underlying the Eighth Amendment.'" *Gregg v. Georgia*, 428 U.S. 153, 173 (1976), quoting *Trop v. Dulles*, 356 U.S. at 100 (plurality opinion). These cases underscore the essential principle that, under the Eighth Amendment, the State must respect the

[32] Michel Foucault, *Discipline and Punish: The Birth of the Prison* (New York: Vintage, 1979), at pp. 3-6 and 32-69.

human attributes even of those who have committed serious crimes." *Graham v. Florida*, 560 U.S. 48, 58-59 (2010). Indeed, by protecting such persons, "the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Hall v. Florida*, 134 S.Ct. 1986, 1992 (2014).

## CONCLUSION

Mr. Hamm respectfully submits that he has met his burden in this case to show that Alabama's planned use of intravenous lethal injection will cause him excruciating pain, in violation of the Eighth Amendment's prohibition on cruel and unusual punishment. First, Mr. Hamm has established a "substantial risk of serious harm," given that peripheral venous access will be impossible and central venous access poses serious risks, both in general and as applied specifically to Mr. Hamm. *Baze*, 552 U.S. at 50. Second, Mr. Hamm has provided an alternative that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain"— namely an oral injection of a lethal drug cocktail, which will cause a quick and painless death for Mr. Hamm. *Id.* at 1532. Mr. Hamm has met his burden under Alabama law and, as such, respectfully requests that this Court grant relief. Moreover, Mr. Hamm has shown that the Defendants' current practices of punishment, especially the combination of all five dimensions of his punishment, constitute a "great increase" of Doyle Hamm's punishment—his sentence of death—in violation of his Eighth Amendment rights. *In re Medley*, 134 U.S. at 171.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff Doyle Lee Hamm respectfully requests that this Court:

A. Enter a declaratory judgment that defendants' plans to execute Mr. Hamm by intravenous lethal injection violate Mr. Hamm's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

B. Grant injunctive relief to enjoin the defendants from proceeding with the execution of Mr. Hamm by an intravenous lethal injection, which will cause Mr. Hamm cruel and needless pain, in violation of the Eighth Amendment.

C. Grant injunctive relief ordering defendants to immediately cease and desist from planning or threatening Mr. Hamm with intravenous lethal injection by excessively drawing blood or in any other way continuing to pursue intravenous lethal injection.

D. Grant any further relief as it deems just and proper.

This, the 16th day of January, 2018.

Respectfully submitted,

Bernard E. Harcourt

Bernard E. Harcourt
Bar Number: ASB-4316-A31B
Attorney for Plaintiff Doyle Hamm
COLUMBIA LAW SCHOOL
435 West 116th Street
New York, New York 10027
Telephone: (212) 854-1997
Fax: (212) 854-7946
Email: beh2139@columbia.edu

CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2018, I served a copy of the attached pleading by electronic mail to opposing counsel, Assistant Attorneys General Thomas Govan and Beth Jackson Hughes at tgovan@ago.state.al.us and bhughes@ago.state.al.us, as well as to the Docket Clerk of the Capital Litigation Division of the Office of the Alabama Attorney General, Courtney Cramer at ccramer@ago.state.al.us.

BERNARD E. HARCOURT
*Counsel of Record*